```
1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2
                     FORT PIERCE DIVISION
3
                 CASE NO:  23-cv-14056-RMM
4

5

6
MIL MUJERES,              )
7                         )
          Plaintiff,      )
8  v.                     )
                          )                May 18, 2023
9  RUBIC LLC, et al.,     )
                          )                Pages 1 - 137
10         Defendant.     )
   _____/
11

12

13

14

15                    DISCOVERY HEARING

16         BEFORE THE HONORABLE RYON M. MCCABE
              UNITED STATES MAGISTRATE JUDGE
17

18

19

20
   APPEARANCES:
21
   On behalf of the Plaintiff:
22
                   LEWIS BRISBOIS BISGAARD & SMITH, LLP
23                 110 SE 6th Street
                   Suite 2600
24                 Fort Lauderdale, FL 33301
                   BY:  DAVID H. HAFT, ESQ.
25                 BY:  DAVID ROBBINS, ESQ.
```

```
 1   APPEARANCES CONTINUED:

 2   On behalf of the Defendants:

 3                   LAW OFFICES OF ANDRE G. RAIKHELSON, LLC
                     301 Yamato Road
 4                   Suite 1240
                     Boca Raton, FL 33431.
 5                   BY:  ANDRE G. RAIKHELSON, ESQ.

 6

 7

 8

 9
     Transcribed by:
10
                     BONNIE JOY LEWIS, R.P.R.
11                   7001 SW 13 Street
                     Pembroke Pines, FL  33023
12                   954-985-8875
                     caselawrptg@gmail.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
2
                          I N D E X

3  THE WITNESS:                                    PAGE:

4
   **KATERINA PANOVA**
5

6  Direct Examination by Mr. Raikhelson:            4

7  Cross Examination by Mr. Haft:                  60

8

9

10  **YANINA SHARILO**

11
   Direct Examination by Mr. Raikhelson:          101
12
   Cross Examination by Mr Haft:                  114
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Thereupon, the following proceeding was held:)

2              THE COURTROOM DEPUTY:  The United States District

3    Court in and for the Southern District of Florida is now in

4    session.  The Honorable Ryon McCabe presiding.

5              THE COURT:  All right.  Good afternoon, everyone.  You

6    can have a seat.

7              MR. HAFT:  Good afternoon, Your Honor.

8              MR. ROBBINS:  Good afternoon, Your Honor.

9              MR. RAIKHELSON:  Good afternoon, Your Honor.

10             We are here in the case of Mil Mujeres versus Rubic

11   LLC, et al.  It is Case Number 23-cv-14056.

12             Let's do appearances first starting with the

13   Plaintiff, please.

14             MR. HAFT:  Good afternoon, Your Honor.

15             David Haft and David Robbins from Lewis Brisbois on

16   behalf of the Plaintiff.

17             THE COURT:  All right.  Defendant.

18             MR. RAIKHELSON:  Good afternoon, Your Honor.

19             Andre Raikhelson.  I represent the Defendants Rubic

20   LLC and Katerina Panova.

21             THE COURT:  Okay.  Let me get your names again.

22             MR. HAFT:  Certainly, Your Honor.  David Haft;

23   H-A-F-T.

24             THE COURT:  All right.

25             MR. ROBBINS:  David Robbins; R-O-B-B-I-N-S.

1           THE COURT:  Okay.  Perfect.

2           All right.  Great.  All right.  So we are here on the

3    Plaintiff's motion for a preliminary injunction.  I will turn

4    it over to you all.  Do you want to do some opening statements

5    first or what's your preference?

6           MR. HAFT:  Yes, Your Honor.

7           If Your Honor is inclined, my colleague Mr. Robbins

8    who is one of our associates, a fifth year associate would like

9    to give the opening on behalf of the Plaintiff.

10          THE COURT:  Excellent.  So let's hear some brief

11   openings and then we will go into evidence.

12          Mr. Robbins.

13          MR. ROBBINS:  Could I approach?

14          THE COURT:  Absolutely.

15          MR. ROBBINS:  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MR. ROBBINS:  May it please the Court.

18          We live in difficult times.  We have been granted

19   access to a massive amount of information, but we as a society

20   are struggling with how to verify that information and how to

21   distinguish between that which is false and that which is true.

22          This struggle underlies the Plaintiff's motion for a

23   preliminary injunction in which the Plaintiff Mil Mujeres seeks

24   to temporarily remove libelous content from the Defendants'

25   website.

1          This Court should have no hesitation in granting the

2    requested injunction as there exists ample evidence to show

3    that Mil Mujeres is not a scam and is not a fraud.  Let me be

4    precise and specific.

5          The evidence will show that Mil Mujeres is a 501(c)(3)

6    nonprofit law firm founded in 2007 to address the growing need

7    for bilingual legal services.  Through the advocacy of its

8    seven licensed attorneys Mil Mujeres has helped more than 5,000

9    clients with legal services and has helped more than 20,000

10   people with information services throughout the United States.

11         Unfortunately, the future of Mil Mujeres's reputation,

12   its goodwill and more importantly its business is being

13   compromised by hosting defamatory articles published by the

14   Defendants Kateryna Panova and Rubic LLC.

15         Beginning in January of 2023, the Defendants published

16   four articles concerning Mil Mujeres and its practice of law.

17   Without burdening the Court right now with the totality of the

18   falsity of those articles, the Defendants have made the

19   following misrepresentations about Mil Mujeres.  That Mil

20   Mujeres is a scam --

21         MR. RAIKHELSON:  Your Honor, I want to mention to the

22   Court that I don't know if the witnesses should be sequestered

23   now or if that is going to be done during testimony.

24         I don't know if -- whatever the Court wishes to do,

25   but I wanted to let the Court know that you have witnesses

1    listening in right now.

2          THE COURT:  I was just thinking about that.  What is

3    your on witnesses?  Normally we sequester them.

4          MR. ROBBINS:  I felt that they would be sequestered.

5    I didn't realize that they were actually able to hear the

6    testimony.

7          THE COURT:  Let's do this.  Technologically,

8    Stephanie, can we turn off or mute those that will be

9    witnesses?

10         THE COURTROOM DEPUTY:  We will put them back in the

11   waiting room.

12         THE COURT:  Okay.

13         THE COURTROOM DEPUTY:  And the witnesses should not

14   log off.

15         THE COURT:  So, witnesses, don't log off, but you will

16   go into the waiting room.

17         THE INTERPRETER:  (Inaudible.)

18         MR. RAIKHELSON:  And that was the interpreter.

19         THE COURT:  That was the interpreter.

20         MR. RAIKHELSON:  That was the interpreter, Your Honor.

21   That was not a witness.

22         THE COURT:  All right.

23         MR. ROBBINS:  They made the following

24   misrepresentations --

25         MR. RAIKHELSON:  Thank you.

```
 1          THE COURT:  All right.  Mr. Robbins -- the witnesses
 2   are sequestered, Stephanie?
 3          THE COURTROOM DEPUTY:  Yes, Judge.
 4          THE COURT:  Okay.  Mr. Robbins, you can continue.
 5          MR. ROBBINS:  They made the follow misrepresentations
 6   about Mil Mujeres.  That Mil Mujeres is a scam and Mil Mujeres
 7   is a fraud and Mil Mujeres is being investigated by the FBI.
 8   That Mil Mujeres has a retainer agreement that is a fiction and
 9   that Mil Mujeres practices law without licensed attorneys.
10          The evidence will show that Mil Mujeres is not a scam
11   and is not a fraud, and is not being investigated by the FBI.
12   It has the standard typical retainer agreement and practices
13   law with licensed attorneys.
14          After discovering the defamatory articles published by
15   the Defendants, Mil Mujeres sent correspondence to the
16   Defendants putting them on notice for the falsity of their
17   statements.  That notice went ignored forcing Mil Mujeres to
18   file the instant lawsuit.
19          Upon immediately being served with a lawsuit, the
20   Defendants doubled down with its misrepresentations and
21   published a YouTube video reasserting all their previous
22   defamatory statements and stating that the intent of such
23   statements was to put Mil Mujeres out-of-business.
24          When these publications are open to the public, Mil
25   Mujeres is not free to help its clientele and any future
```

1  clientele are being deterred from seeking Mil Mujeres'

2  services.

3          Since the evidence and importantly the Defendants'

4  lack of evidence will show that the representations made by

5  Defendants are false and defamatory, this Court should enter a

6  temporary injunction in favor of Mil Mujeres.

7          Thank you.

8          THE COURT:  All right.  Thank you.

9          All right.  Defense.

10          MR. RAIKHELSON:  Thank you, Your Honor.

11          Well, as a threshold matter, there is no need for

12  theatrics.  I think the standard for this case for this hearing

13  is clear and what the Court has defined as clear and who bears

14  the burden.

15          And it is the Plaintiff who bears the burden of

16  establishing every single element that would substantially

17  likely to succeed on the merits, irreparable harm, threat or

18  injury, and a public -- there's a public need for it.

19          And in doing so, I have in my hand the Plaintiff's

20  exhibit and witness list for evidentiary hearing on Plaintiff's

21  motion for preliminary injunction.  This was filed with the

22  Court.

23          And what was filed with the Court there are no actual

24  witnesses.  All of the witnesses that they have listed are

25  testifying by way of declaration.  Now, I just want to make it

1  clear that the Plaintiff wanted this hearing.  Their proposed

2  order wanted an evidentiary hearing.  The Court gave them that

3  evidentiary hearing and I do not consent to have any testimony

4  by declaration.

5          For example, none of the witnesses and exhibit lists

6  that opposing counsel just talked about the retainer agreement,

7  none of the exhibits are the actual retainer agreement that the

8  Court is going to review.

9          Moreover, we have the declaration of Gary Royal.  Gary

10  Royal is an attorney that supposedly works for Mil Mujeres'

11  Legal Services, which is not Mil Mujeres Inc.  It is not a

12  d/b/a and that is another issue.

13          But if we look at his State Bar of California, we have

14  that he was admitted to the State Bar in 2001.  Inactive in

15  2009.  In 2010 he was inactive because of disciplinary charges.

16  Again, in 2011, disciplinary charges were filed and later in

17  2011 he was deemed inactive.

18          In 2015 he was active again and later in 2015, he was

19  not eligible to practice law in California because there was

20  discipline with actual suspension and currently pending there

21  are two disciplinary actions by the California State Bar.

22          This is their executive counsel who testified in

23  declaration that he manages all of these -- he manages Olga

24  Koloditskaya and other attorneys, but I don't have the

25  opportunity to cross-examine him on the stand.  I don't have

1  the opportunity to say anything in contravention to what he has

2  declared even though if it is patently untrue.

3       And the excuse that I am anticipating is that all of

4  these individuals, they are not in the State of Florida, except

5  for probably one; except for Oscar Estrado Rodriguez, but they

6  are not in the State of Florida.

7       And Your Honor, that didn't stop my client from filing

8  a motion to appear by Zoom and the Court granted it.  I am

9  assuming, although sometimes people say it is not good to

10  assume, but I am assuming if the Court was so inclined as to

11  grant my motion, the Court would have been just so inclined to

12  grant the Plaintiff's motion if they had wanted the same thing.

13       So for those reasons you have issues here that they

14  are not able to demonstrate any element of what they are

15  proposing.  All you have heard in opening arguments is nothing

16  more than theatrics and they are unhappy that these articles

17  are there.  But there is no substantial competent evidence,

18  which is what this Court needs to review, substantial competent

19  evidence in favor of the Plaintiff.

20       None of the witnesses are here, not by Zoom, and not

21  in person.  I don't consent to them testifying by declaration.

22  The, quote unquote, retainer agreement is not before this

23  Court.  And the one attorney that has on her Florida Bar

24  profile, Lisa Delaphe (phonetic), Mil Mujeres Legal Services,

25  not Mil Mujeres, Inc.  As this Court knows in Florida it is

1   improper and fundamentally in contravention of Florida Bar

2   rules to practice as a corporation.

3          There are certain entities that a practice can operate

4   on such as a PLLC because there is no such thing as a corporate

5   protection for attorneys.  We are liable and we have a

6   fiduciary duty to our clients.

7          As it pertains to all of the other attorneys, for

8   example, Olga Koloditskaya, again, she is not here to testify.

9   She is testifying by declaration.  I don't consent to that, but

10  if she was here, she should be confronted with the fact that

11  nothing on her DC Bar profile says that she is an attorney for

12  Mil Mujeres.

13         In fact, I printed out her DC Bar profile and it is in

14  the exhibits as well that opposing counsel has submitted as an

15  attachment to Gary Royal's declaration.

16         Her business address is blank.  Her e-mail address is

17  not Mil Mujeres e-mail address.  And when you Google her, you

18  see Law Offices of Olga Koloditskaya and nothing about Mil

19  Mujeres.  Nothing about that anywhere and we can go on and on

20  and on with every single attorney that they say works at Mil

21  Mujeres.

22         They have non Mil Mujeres e-mail addresses.  Their Bar

23  profiles in their respective states don't say anything about

24  Mil Mujeres and this is the worst part and this is why I don't

25  consent to declarations because they are not sitting there.  So

1   I can't ask them a single question about it and I can't

2   cross-examine a piece of paper and I can't cross-examine a

3   declaration.

4           This Court's order for this hearing was very specific.

5   This Court said it was going to be live in-person testimony.

6   It is what the opposing side wanted.  This Court said that we

7   have to provide witnesses and exhibit lists and we have to

8   disclose it to the opposing side by May 15th.

9           There was no consent to have this done by

10  declarations.  In fact, if this was to be done by declarations

11  we wouldn't need an evidentiary hearing because the Court would

12  just review the declarations and weigh the declarations against

13  each other.

14          My client, who is out-of-state, is here to testify as

15  a witness.  Out-of-state able to testify and we are ready,

16  willing, and able to defend our position.

17          And even though we don't bear any burden of proof we

18  are prepared to show two things.  Number one, is that the

19  information that my client got was true and she based her

20  articles on the sources and information and she believed

21  everything that she wrote was true.

22          Number two, there is no irreparable injury.

23  Interestingly enough, opposing counsel did not say anything in

24  his opening argument about irreparable injury.  In fact, they

25  didn't go through any of the elements.

1      Irreparable injury can be found as they wrote in their

2  original motion by goodwill.  So if there is a lack of

3  goodwill, the Eleventh Circuit and the Southern District of

4  Florida and, frankly, all of the Middle District of Florida

5  federal courts have found that a lack of goodwill or an attack

6  on goodwill is irreparable harm, but you can't have your cake

7  and eat it, too.

8      There are cases where if goodwill can be calculable --

9  so, for example, the cases that we cited to *Recall Company v.*

10 *PGT Indus* (phonetic).  It's a Middle District of Florida case;

11 Case Number 8:13-cv-1433.  It's a case where the Judge pretty

12 much said you can't have your cake and eat it, too.

13     Either your lack of goodwill can be definitely

14 calculable to reach that $75,000 threshold or above and,

15 therefore, it is not considered irreparable harm because it can

16 be reduced to money damages, or it is something that is so

17 ingrained you have lost so much substantially you can't

18 calculate it at all.  And therefore, it is irreparable harm

19 because you can't calculate it and you can't calculate what

20 would happen in the future, but you can't have it both ways.

21     The only reason why this Court has jurisdiction is

22 diversity.  And in their motion for preliminary injunction they

23 said that they meet the $75,000 threshold because of the

24 irreparable harm that we caused.

25     Well, which is it?  Have you reached $75,000 threshold

1  because of irreparable harm because it is something readily

2  calculable, or can you not calculate the irreparable harm and,

3  therefore, you don't know what your actual damages are.

4  Therefore, you are saying that we meet that threshold of

5  irreparable harm based on that.

6           Again, this is an issue because we don't have anyone

7  on their side to testify as to that.  There is no analysis.

8  Frankly, without that, there is no possible way that this Court

9  can rule in favor of the Plaintiff because there is no

10  competent substantial evidence in front of the Court for the

11  Plaintiff.

12           Thank you.

13           THE COURT:  All right.  Before you go any further, let

14  me ask my courtroom deputy.  I see there is one other person.

15  Is that the court reporter?

16           THE COURTROOM DEPUTY:  She's the Defendant.

17           THE COURT:  Defendant.  Okay.  Good.

18           All right.  So we don't have a court reporter right

19  now.  Just so everybody understands these proceedings are being

20  recorded because we don't have a court reporter as we sometimes

21  have.  So to the extent you all want to order the transcript at

22  a later point in time, you will have to order it and then it

23  will be transcribed.

24           All right.  I've heard openings from both sides.  So

25  let me turn now to the Plaintiff in terms that you have the

1  burden of proof and --

2          MR. HAFT:  Certainly, Your Honor.

3          Your Honor, just to make the Court aware and to the

4  extent I will make the *ore tenus* motion the --

5          THE COURT:  You have to speak into the microphone and

6  because we are using the DAR, which is the digital audio

7  recording system, it is extra important that you speak right

8  into the microphone so that we can capture your words one day.

9          MR. HAFT:  My apologies.

10         Certainly.  If the Court is unaware, I will make it as

11  an *ore tenus* motion right now.  The Plaintiff has filed a

12  motion for the Court to take judicial notice of certain public

13  records pursuant to Federal Rules of Evidence 201(b)(2).

14         Specifically with respect to the licensure and in good

15  standing nature of the respective attorneys employed by the

16  Plaintiff, as well as the Plaintiff's 501(c)(3) status with the

17  IRS, as well as their three most recent years of Form 990 tax

18  forms, which are filed by nonprofit organization with the IRS.

19         So we would ask the Court to accept those as public

20  records that are readily available and not subject to

21  reasonable dispute.

22         THE COURT:  All right.  Are those things on your

23  exhibit list?

24         MR. HAFT:  They are.  The state licensure certificates

25  are part of Mr. Royal's declaration.  And I believe the

1  501(c)(3) status was not separately identified.  It is part of

2  the motion, which is Docket Entry 35.

3          THE COURT:  All right.  So I am looking at a motion

4  here Docket Entry 35.

5          MR. HAFT:  Yes, sir.

6          THE COURT:  For the Court to take judicial notice of

7  the public records.  And all the records that you want me to

8  take judicial notice of are attached to it; is that right?

9          MR. HAFT:  That's right, Your Honor.

10          THE COURT:  Okay.  And how many documents are there?

11          MR. HAFT:  I believe there are eight separate

12  certificates of good standing.  I will tell you right now, Your

13  Honor.

14          THE COURT:  What I would like to do is just go

15  one-by-one and I am going to hear from the Defense whether they

16  object or don't object.

17          MR. HAFT:  Absolutely.  And the Defense just made a

18  reference to the first exhibit here, which is Mr. Royal's State

19  of California Bar records, which as of the present date

20  reflects his active status and that is Exhibit A or Exhibit 1

21  to the motion for judicial notice.

22          THE COURT:  So we will start with that one.

23           Defense, do you object to this one?

24          MR. RAIKHELSON:  I object as to the State Bar of

25  California, it says active status.  It says there are two cases

1  pending.  I don't know how active that status is.  Is it active

2  with limitations?  That was kind of my whole issue and is what

3  I mentioned in opening that I don't have a chance to

4  cross-examine Mr. Royal on this.

5          So to have these admitted into evidence or to have the

6  Court take judicial notice of really anything kind of end-runs

7  the point of an evidentiary hearing where the parties are

8  supposed to testify in person.

9          And as for the tax information, I have never gotten

10 that.  It is not anywhere and the Court gave very specific

11 rulings that the evidence that is to be used is to be disclosed

12 by May 15th.  We followed Your Honor.

13         THE COURT:  What is the judicial notice rule?

14         MR. HAFT:  It is Federal Rules of Evidence 201(b)(2)

15 Your Honor, which provides that the Court may judicially notice

16 the fact and not the subject to reasonable dispute because it

17 can be accurately and readily determined from sources who's

18 accuracy cannot be questioned.  And the Court may take judicial

19 notice at any time if requested and that is 201(c)(2)

20 Subsection D.

21         MR. RAIKHELSON:  And I would also like to mention that

22 this was filed either yesterday or today and I don't have it in

23 front of me.

24         MR. HAFT:  And Your Honor, these certificates from the

25 State are part of Mr. Royal's declaration, which were timely

1  filed as well.

2         THE COURT:  Were they attached to his declaration?

3         MR. HAFT:  They were.  Yes, Your Honor.

4         MR. RAIKHELSON:  And I'm looking at the rule and it

5  says that the Court may take judicial notice on its own or must

6  take judicial notice if a party requested and the Court is

7  supplied with the necessary information.

8         There are things in these, for example, the State Bar

9  of California that are questions that go to the heart of the

10 matter.  For example, whether Mr. Royal may, in fact, practice

11 law and to what extent is he able to practice law.

12        For the Court to take judicial notice, as I stated

13 before, would end-run the need for testimony because it goes to

14 the heart of what the Plaintiff is asking for in this case.

15        THE COURT:  If something falls within the scope of the

16 judicial notice rule, do you still have to get passed the

17 hearsay rule?  In other words, do you still have to show that

18 it is a business record of the State Bar of California?

19        MR. HAFT:  I don't believe so, Your Honor.  It says

20 that anything that can accurately be determined from sources

21 whose accuracy cannot be questioned.

22        So this is from the State Bar of California.  It is

23 from the Bar website, which is reflected by the document

24 itself.  It provides a license number.  It provides an active

25 status.  So I don't believe you would, Your Honor.  I think 201

1  speaks for itself.

2        THE COURT:  Are the evidentiary rules relaxed during

3  preliminary injunction?

4        MR. HAFT:  They are, Your Honor, yes.

5        MR. RAIKHELSON:  I agree that they are, but I disagree

6  that they are totally wiped off.  There is still Rules of

7  Evidence.  There is still things such as evidence that should

8  be admitted.

9        And there is a reason why this Court asked for the

10  parties, by May 15th, to produce a witness and exhibit list

11  because the Court understands very well that there shouldn't be

12  litigation by surprise.

13        And if somebody wants to testify as to the

14  truthfulness of something or the lack thereof, which is their

15  position, that should be the actual testimony which is why the

16  Court was very clear in its order.

17        THE COURT:  I'm going to overrule the objection and I

18  am going to admit this one.  I am going to take judicial notice

19  of Exhibit 1 here to Docket Entry 35.  And once I take judicial

20  notice of it, are you offering it into evidence on this exhibit

21  list or what are you doing?

22        MR. HAFT:  Yes, Your Honor.

23        THE COURT:  All right.  So is there a corresponding

24  number somewhere on the exhibit list that corresponds to this?

25        MR. HAFT:  It is Exhibit A, I believe, to Exhibit 1 of

1   the declaration of Gary Royal.

2          THE COURT:  All right.  So I will admit that one.

3          MR. HAFT:  Now, Exhibit 2 is the Florida Bar records

4   for Lisa Delaphe.  Somewhere to Exhibit 1 is a record produced

5   by the Florida Bar and was attached to the motion as well as

6   Mr. Royal's declaration, which identifies Mr. Royal as a member

7   in good standing with the Florida Bar with corresponding Bar

8   number.  Her mailing address as well as her date of admission.

9          THE COURT:  Same objection, I take it?

10         MR. RAIKHELSON:  Same objection.  I don't have an

11  opportunity to cross-examine any of these witnesses.

12         THE COURT:  All right.  I will overrule that

13  objection.

14         Where is this one?  In other words --

15         MR. HAFT:  This is Exhibit -- is it A or B, Dave?  I

16  just want to give the Court -- it is attached to Gary Royal's

17  declaration as Exhibit 2.

18         And I would just note to the Court that these were

19  timely filed on the 15th and no objection was raised in

20  response to these prior to right now.

21         THE COURT:  Okay.  So for recordkeeping purposes, do

22  you have an exhibit list?

23         MR. RAIKHELSON:  Yes, Your Honor.

24         THE COURT:  Plaintiff's exhibit and witness list and

25  it looks like Plaintiff's Exhibit 1, at least on my list, is

1   the complaint.  Is there a different one?

2           MR. HAFT:  I'm sorry, Your Honor.  I misspoke.

3           THE COURT:  The question is they want to admit it into

4   this record right now.  So I need to give it a number.

5           MR. HAFT:  I apologize, Your Honor.

6           It is Exhibit Number 8 on the Plaintiff's exhibit and

7   witness list, which is the declaration and the first two are

8   sub exhibits -- one and two are the first two we have just gone

9   through.

10          THE COURT:  All right.  So it is Exhibit 8, the

11  declaration of Gary Royal?

12          MR. HAFT:  Yes, Your Honor.

13          THE COURT:  And this Florida Bar member profile is --

14          MR. HAFT:  Sub to that declaration.

15          THE COURT:  So it would be 8-2.

16          MR. HAFT:  And the first one was 8-1.

17          THE COURT:  Okay.  So we are going to say 8-1 and 8-2

18  are admitted into evidence.

19          All right.  The next item in your motion for judicial

20  notice is number 3.

21          MR. HAFT:  Yes.

22          THE COURT:  Is DE 35, Exhibit 3.  This is, looks like

23  a Bar record from the New York court system.

24          MR. HAFT:  That's correct, Your Honor.  And this is

25  for Olga Koloditskaya, an attorney also affiliated with the

1  Plaintiff and also identifying her registration number, her

2  good standing, and a detailed report as of 5/15 2013 with the

3  New York State Bar Association.

4         THE COURT:  All right.  In order to save time here, it

5  looks like number 3 is a New York Bar record.  Number 4 is a

6  New Jersey Bar record.  Number 5 is a DC Bar record.  Number 6

7  appears to be a Florida Bar record.  Number 7 is a -- what is

8  number 7?

9         MR. RAIKHELSON:  Your Honor, if I may?

10         My objection to this New York State Bar record for

11  example doesn't list --

12         THE COURT:  I'm just trying to clarify what they are

13  first.  What's number 7?

14         MR. HAFT:  It's a State of Alabama Bar record.

15         THE COURT:  All right.  Alabama is 7 Bar record and

16  number 8 is a New York Bar record?

17         MR. HAFT:  That's correct, Your Honor.

18         THE COURT:  And that's the entirety of what you are

19  asking me to take judicial notice of?

20         MR. HAFT:  As it relates to the attorneys, Your Honor.

21         THE COURT:  And all these items 1 through 8 all

22  attachments to exhibit 8 on your exhibit list?

23         MR. HAFT:  That's correct, Your Honor.

24         THE COURT:  Okay.  Now I will hear argument.

25         MR. RAIKHELSON:  Incorporating what I had mentioned

1   before, I would also like to -- based on, for example, Olga

2   Koloditskaya that's number 3.  It's a New York State Bar

3   record, but it doesn't show Mil Mujeres.  The business name is

4   Law Offices of Olga Koloditskaya and it has a Washington, D.C.

5   address and her e-mail is not an Mil Mujeres e-mail address.

6   Neither is number 4 from the same individual.  Neither is

7   number 5 from the same individual.  It doesn't even have a

8   business address.  It has a Hotmail e-mail address.

9        Neither is number 6, the Bar profile of Mr. Estrado

10  Rodriguez does not have a Mil Mujeres e-mail or mail address.

11  Neither does number 7, Miss Linda Batista.  So none of the --

12  and neither does number 8 have an Mil Mujeres e-mail address or

13  business name on file.

14       So to the extent that they are making the

15  representation that these are all Mil Mujeres employees, the

16  record does not reflect that.

17       And to have that admitted as proof that these are Mil

18  Mujeres employees, it would be fundamentally improper without

19  proper cross-examination because the records, although they

20  speak for themselves, show something very different than what

21  the declarations are saying.

22       THE COURT:  All right.  I am overruling the objection

23  and I am admitting into evidence Exhibits 8-1 through 8.  I am

24  taking judicial notice of these eight Bar records.  I find that

25  the evidentiary rules are relaxed at a preliminary injunction

1   hearing.  And the points that Defense counsel is raising go to

2   weight and he can argue about the relevant weight of those

3   exhibits as part of his argument.

4           What is the your evidence?

5           MR. HAFT:  Your Honor, the next matter we would ask

6   the Court to take judicial notice of, admittedly is not part of

7   the exhibit list, is the IRS tax filings for the Plaintiff

8   which are public record and not subject to (inaudible)

9   questioning or the questioning of its accuracy.

10          And this is from the nonprofit website Guide Star,

11  which is a website that is maintained with records and is

12  publically available for the public's view and inspection of

13  501(c)(3) organizations.  It is, in essence, to prevent people

14  from being scammed by organizations claiming to be 501(c)(3)

15  organizations.

16          And what we are asking the Court to take judicial

17  notice of are the tax returns.  And as Your Honor will note,

18  which is Exhibit B to the motion itself, the 2019 report

19  underneath on the right-hand corner under the year 2019

20  specifically states open to public inspection.

21          So this is information that is publically available.

22  This is able to be reviewed at any given time by the public and

23  it is documents that are filed with the IRS as well as

24  corresponding financials, which reflect the 501(c)(3) status of

25  the Plaintiff here.

```
 1              THE COURT:  All right.  So you are asking me to take
 2   judicial notice and then admitting into evidence the tax
 3   returns for your client?
 4              MR. HAFT:  That's correct.
 5              THE COURT:  For what years?
 6              MR. HAFT:  '18, '19; I believe '18 through '20, Your
 7   Honor.
 8              THE COURT:  All right.  '18, '19, and '20 and are they
 9   on this exhibit list?
10              MR. HAFT:  They are not on the exhibit list, Your
11   Honor.  They do meet the criteria, though, for documents that
12   the Court is able to take judicial notice of under Federal Rule
13   201.
14              THE COURT:  Have you provided these to opposing
15   counsel?
16              MR. HAFT:  Yes, we have, Your Honor.
17              Part of Docket Entry 35, they are Exhibit B to the
18   motion and they start at Docket Entry 35-2 and they are all
19   marked as 34-2.  And there are approximately, it looks to be
20   about 80 some odd pages of tax documents that are attached
21   here, Your Honor.
22              THE COURT:  And when was the DE-35 filed, yesterday?
23              MR. HAFT:  Yes, Your Honor.
24              THE COURT:  All right.  Well, let me just ask you.
25   Why didn't you put these on your exhibit list?
```

1          MR. HAFT:  Your Honor, we were seeking to get

2     documents directly from the IRS, which has proven to be a

3     little bit challenging.  So once we were able to access some

4     information from Guide Star, I would agree in an ideal world we

5     would have filed these on the 15th, but once they became

6     accessible to us, we immediately filed these with the Court and

7     we served copies of these on opposing counsel.

8          THE COURT:  And why do these tax returns help prove

9     your position?

10          MR. HAFT:  Well, Your Honor, part of the defamatory

11     statements being made by the Defendants here is that the

12     Plaintiff is a fraudulent charitable entity or organization.

13          These documents expressly refute that statement in a

14     lump.  The IRS has recognized the Plaintiff as a 501(c)(3)

15     nonprofit organization since 2007.

16          THE COURT:  All right.  Let me stop you there.

17          Defense, do you dispute that they are a 501(c)(3)?

18          MR. RAIKHELSON:  Your Honor, I don't dispute that they

19     are 501(c)(3) but what I do --

20          THE COURT:  All right.  Let me stop you there.

21          I am going to take judicial notice of the fact that

22     they are a 501(c)(3) entity and I am not going to allow the tax

23     returns into evidence.

24          Next?

25          MR. HAFT:  That's it, Your Honor.

 1          THE COURT:  Okay.  So that's all the evidence you

 2  have?

 3          MR. HAFT:  As far as judicial notice.  Correct, Your

 4  Honor.

 5          THE COURT:  All right.

 6          MR. HAFT:  The declarations based on the matters Your

 7  Honor is taking judicial notice of, the good standing and the

 8  licensure of the respective attorneys associated with the

 9  Plaintiff.  In addition to the 501(c)(3) status of the

10  Defendant.

11          The Defendants' statements in the various articles and

12  publications, specifically, the Plaintiff practices law without

13  unlicensed attorneys is undisputedly false.  The statement that

14  the Plaintiff --

15          THE COURT:  Let me stop you.

16          Because it sounds like you are making an argument now.

17  So what I want to do is just focus on your evidence.

18          What is your next piece of evidence you want to

19  introduce?  And then, once we get all your evidence in, then I

20  am going to ask them what evidence they have.

21          MR. HAFT:  Sure.

22          THE COURT:  So what evidence do you have next?

23          MR. HAFT:  The other pieces of evidence are the two

24  declarations which I identified on the Plaintiff's Exhibit

25  list.

```
 1              THE COURT:  What's the first one?

 2              MR. HAFT:  The first one is the declaration of Gary

 3    Royal, which we have been discussing, which is Exhibit 8.

 4              THE COURT:  All right.  So Exhibit 8, which is the

 5    declaration itself, I have already admitted the exhibits to it.

 6              Do you have a copy of that for me?

 7              MR. HAFT:  My associate is just grabbing that out of

 8    her binder.  If Your Honor is okay with it, if I could approach

 9    with it, please?

10              THE COURT:  Yes, please.

11              MR. HAFT:  Your Honor, if I may approach?

12              THE COURT:  Yes, please.

13              By the way, do you have a -- I saw a notebook there.

14    Do you have a notebook with all these exhibits for me?

15              MR. HAFT:  Yes, Your Honor.

16              THE COURT:  I would rather have that.

17              MR. HAFT:  Sure.

18              THE COURT:  If I can just go one-by-one and then I

19    will either let your stuff in or not.

20              Okay.  So I am looking at a notebook here and it

21    appears to have a bunch of tabs.  So tell me which tab you want

22    me to go to.

23              MR. HAFT:  Certainly, Your Honor.

24              Exhibit 8 that we just discussed as well as Exhibit 9

25    which is the declaration of Natalia (inaudible).
```

1    MR. RAIKHELSON:  Your Honor, can we do this one at a
2  time because they just mentioned two declarations right now.
3    THE COURT:  What is the next exhibit that you are
4  offering into evidence?
5    MR. HAFT:  First declaration was 8.
6    THE COURT:  Is that Tab 8 in this book?
7    MR. HAFT:  So if you turn to Tab 8, Your Honor, that's
8  the exhibit and witness list.
9    THE COURT:  Okay.
10    MR. HAFT:  And then, from there, it's Exhibit 8 to
11  that list.  I apologize.  I was under the impression it was a
12  sub tabbed, but it was not.
13    THE COURT:  Okay.
14    MR. HAFT:  So it will be Exhibits 8 and 9 identified
15  therein.
16    THE COURT:  Okay.  So I am looking at -- and opposing
17  counsel, do you have it, too?
18    MR. RAIKHELSON:  I have my own copies.  I wasn't
19  provided a notebook, but I have my own.
20    THE COURT:  So I am looking at something that says
21  declaration of Gary Royal and it has Exhibit 8 on it and it
22  appears to be a multipage -- all right.  Again, I am looking at
23  what is on your exhibit list and you would like to offer it
24  into evidence?
25    MR. HAFT:  That's correct, Your Honor.

```
 1          THE COURT:  All right.  Defense, do you have an
 2   objection?
 3          MR. RAIKHELSON:  Your Honor, I clearly have an
 4   objection.
 5          These declarations, if we are going to take the first
 6   one, Gary Royal, it goes to the heart of what they have to
 7   prove and I don't get an opportunity to cross-examine Mr.
 8   Royal.  I don't get an opportunity to ask him questions about
 9   his licensure.  I don't get to ask him questions about anything
10   that he is putting forward.  That's number one.
11          Number two, he is testifying that at present Mil
12   Mujeres consists of seven licensed attorneys, but I can't
13   cross-examine about that either.  And that involves individuals
14   like Olga Koloditskaya whose, for example, Bar membership is
15   something completely different than Mil Mujeres and, in fact,
16   it doesn't even mention Mil Mujeres.
17          So it is more than just weighing the evidence.  This
18   is the crux of what they want to bring up.  Now this Court's
19   order was very clear.  And although the Rules of Evidence are
20   relaxed, this Court's rulings are not relaxed and this Court's
21   ruling held that the testimony should be in person.
22          THE COURT:  I know I am very relaxed.
23          MR. RAIKHELSON:  Yes, Your Honor.
24          I understand that.  I wish I was so relaxed.  I am
25   unfortunately not and probably the reason why I am not relaxed
```

1  is what is being offered here, Court, look at what Gary Royal

2  wrote that proves our case without the crucible of

3  cross-examination.  This is exactly why we have evidentiary

4  hearings so we can weigh the evidence and I have the

5  opportunity to cross-examine.

6          My client and her witness are here and they are going

7  to be subject to cross-examination, but for some reason their

8  witnesses are not subject to cross-examination.

9          THE COURT:  All right.  So I am overruling your

10  objection.  I am admitting Exhibit 8.

11          The arguments you are making are very good arguments

12  but they don't go to admissibility.  They go to the weight.  It

13  may be that this declaration is not as persuasive as the real

14  witnesses that you brought, but I am overruling your objection

15  and I am allowing this into evidence.  Exhibit 8 is admitted.

16          What is your next exhibit?

17          MR. HAFT:  It would be Exhibit 9 to the witness and

18  exhibit list declaration of Natalia (inaudible).

19          THE COURT:  Okay.  So Exhibit 9 is a two-page

20  declaration.

21          And Defense, I imagine you have the same objections?

22          MR. RAIKHELSON:  I have the same objections.

23          THE COURT:  All right.  Again, recognizing the relaxed

24  rule that hearsay is admissible at preliminary injunctions and

25  that the Defense arguments go to weight and not admissibility,

1    I am going to allow Exhibit 9 into evidence.

2            What is your next exhibit?

3            MR. HAFT:  The remaining exhibits, Your Honor, are

4    already of record in the case.  The amended verified complaint

5    or the motion itself.  So I don't think I want to take up the

6    Court's time going back through those.

7            THE COURT:  I think you do, though.  This is an

8    evidentiary hearing on this motion.  So I don't think it is

9    proper to simply refer to a complaint that is in the file.  We

10   should probably mark it.

11           MR. HAFT:  That's actually fine, Your Honor.

12           THE COURT:  If you want your --

13           MR. HAFT:  I think that's fine.  It is a valid point

14   and I am happy to do so.

15           Then, Your Honor, what I would ask the Court to admit

16   here -- we are going to ask the Court -- I will go through it

17   number by number just for ease of reference here and for

18   clarity of the record.

19           THE COURT:  That will be clear that it is admitted and

20   we will get all these objections that Defense may have and --

21           MR. HAFT:  Starting from the beginning of Plaintiff's

22   exhibit and witness list, Plaintiff's Exhibit 1, which is the

23   March 8th of 2023, first amended verified complaint for

24   injunctive and monetary relief and the exhibits attached

25   thereto.

```
 1              THE COURT:  All right.  Any objection?
 2              MR. RAIKHELSON:  Your Honor, I will just end-run it.
 3    I have no objection to Plaintiff's Exhibits 1 through 6.
 4              THE COURT:  All right.  Then Exhibits 1 through 6 will
 5    be admitted.  All right.  Do you have anything else?
 6              MR. HAFT:  Yes, Your Honor.
 7              THE COURT:  All right.
 8              MR. HAFT:  Plaintiff's Exhibit Number 7.
 9              THE COURT:  All right.
10              MR. HAFT:  Is a certified translation of a YouTube
11    video that was published by the Defense in this case after the
12    filing of the instant lawsuit with corresponding exhibits as to
13    the CV of the translator.
14              As well as an English translation of the YouTube
15    video, which was in Russian and that was previously filed with
16    the Court at DE 18-6 as part of the motion that we are here
17    before the Court on for preliminary injunction.
18              THE COURT:  All right.  So it was DE 18-6?
19              MR. HAFT:  That's correct, Your Honor, and that was
20    filed on April 19th of this year.
21              THE COURT:  And it is essentially a piece of paper
22    that says I translated -- it's a translation?
23              MR. HAFT:  That's correct, Your Honor.
24              THE COURT:  Okay.  Defense, any objection to that?
25              MR. RAIKHELSON:  To the extent that it is only used as
```

 1 | a translation of Exhibit 6, which I have consented to, I have
 2 | no objection.
 3 |          THE COURT:  All right.  That will be admitted, then.
 4 | Number 7 will be admitted, which for the record, is also the
 5 | document at DE 18-6.
 6 |          All right.  Any other evidence?
 7 |          MR. HAFT:  Exhibits 8 and 9 we have already admitted.
 8 |          MR. RAIKHELSON:  Your Honor, I will stipulate to
 9 | number 11, too.  It is Defendants' answer in affirmative
10 | defenses.
11 |          THE COURT:  All right.  Exhibit 11 is admitted.
12 |          MR. HAFT:  And the last one -- 8 and 9 were already
13 | admitted.  And Exhibit 10 is correspondence written from my
14 | partner, Shawn Schechter (phonetic) on behalf of the Plaintiff
15 | to the Defense in this matter referencing the false and
16 | defamatory statements that are the subject of today's motion.
17 |          THE COURT:  All right.  Requesting that they take the
18 | website down or something?
19 |          MR. HAFT:  Yes, Your Honor.
20 |          THE COURT:  All right.  Where is that, for the record?
21 |          MR. HAFT:  That is Exhibit 10 to the exhibit and
22 | witness list.
23 |          THE COURT:  Okay.  But is it somewhere else in the
24 | docket besides --
25 |          MR. HAFT:  I believe so.

| 1 | THE COURT:  If not I need a copy of it to put it into |
| 2 | evidence or just tell me where it is. |
| 3 | MR. HAFT:  It was not marked as an exhibit to the -- |
| 4 | THE COURT:  Or you could tell me where it is in this |
| 5 | book. |
| 6 | MR. HAFT:  It is marked as Exhibit 10 to the witness |
| 7 | and exhibit list.  It is correspondence dated February 8th of |
| 8 | 2023 that was sent via certified mail and e-mail from the Lewis |
| 9 | Brisbois to the Defendants. |
| 10 | THE COURT:  Okay.  I see it.  It is in this book at |
| 11 | Tab 8, Exhibit 10. |
| 12 | Defense, any objection to this letter? |
| 13 | MR. RAIKHELSON:  Yes.  So my objection is twofold -- |
| 14 | well, threefold.  First of all, it is hearsay and we don't have |
| 15 | anyone from their firm that is going to testify.  There is not |
| 16 | even a declaration from anyone from their firm willing to |
| 17 | testify.  So there is no testimony.  It is just a piece of |
| 18 | paper; |
| 19 | Number two, it doesn't go to any of the elements that |
| 20 | they have to prove.  Not a single one; |
| 21 | And number three, the letter pretty much says these |
| 22 | are all the false things that you are saying, take it down, |
| 23 | which is pretty much a carbon copy of the complaint which says |
| 24 | here are all the false things that we are accusing you of |
| 25 | saying. |

1          So, first of all, it is duplicative.  Second of all,

2   it is hearsay.  And third of all, there isn't even a

3   declaration that would substantiate that.

4          THE COURT:  All right.  I am going to overrule the

5   objection because the evidence rules are relaxed.

6          And I also note that this is not being offered for the

7   truth of the matter, but rather to show that a request was made

8   to take the we website down.  So I am going to overrule the

9   objection and admit Exhibit 10 here on the exhibit list.

10          Do you have any other evidence?

11          MR. HAFT:  I don't, Your Honor.

12          THE COURT:  Okay.  So you are done with the evidence

13   and you rest your case for this preliminary injunction hearing?

14          MR. HAFT:  Yes, Your Honor.

15          THE COURT:  All right.  Defense, do you have any

16   evidence?

17          MR. RAIKHELSON:  I do, but before that I would, to the

18   extent that it is permissible I would like to ask at this point

19   for a directed ruling.

20          THE COURT:  You can.

21          MR. RAIKHELSON:  Thank you, Your Honor.

22          Because they haven't established -- none of their

23   evidence established -- even if we say okay, they have

24   established a likelihood of success on the merits, they haven't

25   established any of the other elements.  They haven't

1  established irreparable injury or harm.

2          None of the declarations show the damage to

3  reputation.  The damage to ill-will.  All you have is argument

4  from counsel saying that.  The declaration of their executive,

5  Gary Royal, executive director, doesn't mention anything about

6  his reputation.

7          Neither does the declaration of Olga Koloditskaya --

8  well, there isn't a declaration of Olga or Natalia.  So there

9  is absolutely no substantial evidence or really any evidence

10  regarding this.

11          And I would also like to go back to what injunctive

12  relief is.  It is an extraordinary remedy.  It is not something

13  that is doled (phonetic) out lightly.  So what they have

14  presented is pretty much testimony of individuals saying that

15  my client lied, but that's not the only thing they have to

16  prove.

17          They also haven't proved that the threatened injury to

18  the movant outweighs whatever damage the proposed injunction

19  may cause the opposing party because there is absolutely no

20  evidence of that.

21          Essentially what they are asking for this Court to do

22  is to remove, to force my client to remove articles from a

23  website.  So, essentially, they are infringing on a free

24  speech.  What they are asking this Court essentially to do is

25  implement a gag order, but they are not couching it under a gag

1   order.  They are couching it under injunctive relief.

2        So if for the third element threatened injury to the

3   movant outweighs whatever damage the proposed injunction may

4   cause the opposing party, they haven't demonstrated that.  It

5   is not in any of the declarations.  It is not in any exhibits

6   and it is not anywhere.

7        And regarding the injunction, it would be not be

8   adverse to the public interest.  You have essentially a

9   journalist who is publishing information based on knowledge

10  that she has obtained against someone that is claiming that it

11  is false, but there is none of the other elements establishing

12  that.  And they haven't established any of the other elements

13  they needed for the relief that they are seeking.

14        So, for those reasons, Your Honor, even if they can

15  tick one box, they certainly cannot tick the second box, or the

16  third box, or the fourth box.

17        THE COURT:  All right.  So to the extent you have

18  asked me to rule without you putting on any evidence, I am

19  going to take that under advisement.

20        MR. RAIKHELSON:  Okay.

21        THE COURT:  Now, would you like to present evidence?

22        MR. RAIKHELSON:  Yes, Your Honor.

23        THE COURT:  All right.  You can proceed.

24        MR. RAIKHELSON:  So the first witness I would call is

25  Katerina Panova.

1        THE COURT:  All right.  So like we did with the

2   Plaintiff, would you have any documents that you would like to

3   present first or would you like to do that as we go through the

4   witness list?

5        MR. RAIKHELSON:  I am used to doing things as we go

6   through the witnesses as we would in a trial.

7        THE COURT:  So let's do it that way.

8        MR. RAIKHELSON:  Okay.  Thank you.

9        I guess we need to swear her in, right?

10       THE COURT:  Yes.

11       MR. RAIKHELSON:  She is here.

12       THE COURTROOM DEPUTY:  I'm sorry.

13       I apologize to the interpreter.  Madame Interpreter, I

14   don't need you yet.  I'm so sorry.  I let you in early.

15       THE INTERPRETER:  No problem.

16       THE COURT:  Miss Panova, if you would raise your right

17   hand.

18       THE WITNESS:  (Complied.)

19   (Witness sworn.)

20       THE COURTROOM DEPUTY:  Please state your full name for

21   the record.

22       THE WITNESS:  Katerina Panova.

23       THE COURTROOM DEPUTY:  You can pull the your hand

24   down, ma'am.

25       THE COURT:  All right.  You can proceed.

1    MR. RAIKHELSON:  Thank you, Your Honor.

2         KATERINA PANOVA, DEFENSE WITNESS SWORN

3              DIRECT EXAMINATION

4  BY MR. RAIKHELSON:

5  Q.   Miss Panova, can you please give me your background or give

6  the Court your background information?  What is your

7  educational background?

8  A.   **Yes.  I came to the United States from Ukraine.  I have**

9  **been working in (inaudible) for 20 years.  I worked with a**

10  **grant which is a common scholarship for.  I studied in**

11  **(inaudible) University.  I studied journalism at (inaudible)**

12  **University and I graduated with a Master's Degree.  And I am**

13  **the publisher of Rubic LLC and actually not the host of the**

14  **articles in question, but a publisher of a publication.**

15       **My publication serves around two million of immigrants for**

16  **Russian speakers and people from Eastern Europe and (inaudible)**

17  **who speak Russian.  And our goal is to help everybody immigrate**

18  **legally and not break the law and prosper in the United States.**

19  Q.   Okay.  Now let's get to the heart of the matter.  I don't

20  want to the waste any more time.

21       Have you ever said that Mil Mujeres is not a charitable

22  organization or is not a 501(c)(3)?

23  A.   **No.  In fact, in articles we published about them we**

24  **actually stated that they are a nonprofit and give a link to**

25  **(inaudible) to explain who they are indeed a nonprofit.**

1  Q.   Okay.  I am going to show you -- I don't know how to do

2  this.  I want to show her what is on my screen.  I put it

3  through this slider.  I don't know what I am supposed to do?

4           THE COURT:  Stephanie, can you help him or do you

5  know?

6           THE COURTROOM DEPUTY:  You have the ability if you are

7  on Zoom.

8           MR. RAIKHELSON:  I am not on Zoom.  What if I do this?

9  No, now, I can't see anything.

10          THE COURT:  Can we use the Elmo?

11          THE COURTROOM DEPUTY:  No, but I might be able to put

12  the document in front of this camera.  It is going to be awful

13  quality, but yes.

14          THE COURT:  All right.  We can try it out.

15          THE COURTROOM DEPUTY:  This camera right here.  Do you

16  have a printout?

17          MR. RAIKHELSON:  I think so.

18          THE COURT:  I imagine the witnesses are all familiar

19  with the document.  So the quality is probably not going to

20  matter that much.

21          THE WITNESS:  Yes, Your Honor.

22          MR. RAIKHELSON:  Let's see.  I am just trying to find

23  the right page.

24          THE COURTROOM DEPUTY:  It might be possible to put it

25  on the Elmo and I can refocus the camera to the monitor.

```
1          MR. RAIKHELSON:  Okay.  Do you want me to pass this?
2          THE COURTROOM DEPUTY:  It's reversed.
3          MR. RAIKHELSON:  It's reversed?
4          THE COURTROOM DEPUTY:  No, the digital image is
5   reversed.
6          MR. RAIKHELSON:  What if I log onto the Zoom and share
7   my screen?
8          THE COURTROOM DEPUTY:  That you can do.
9          MR. RAIKHELSON:  Your Honor, may I do that?
10          THE COURT:  Absolutely.
11          MR. RAIKHELSON:  Ma'am, can I get the Zoom I.D.?
12          THE COURTROOM DEPUTY:  Are you ready?
13          MR. RAIKHELSON:  I'm ready.
14          THE COURTROOM DEPUTY:  160.
15          MR. RAIKHELSON:  160.
16          THE COURTROOM DEPUTY:  562.
17          MR. RAIKHELSON:  562.
18          THE COURTROOM DEPUTY:  6259.
19          MR. RAIKHELSON:  6259.  And the password?
20          THE COURTROOM DEPUTY:  It is 508.
21          MR. RAIKHELSON:  508.
22          THE COURTROOM DEPUTY:  973.
23          MR. RAIKHELSON:  973.
24          Could you please repeat that.  It says the password is
25   incorrect?
```

```
1          THE COURTROOM DEPUTY:  508.

2          MR. RAIKHELSON:  508.

3          THE COURT:  973.

4          MR. RAIKHELSON:  973.  Okay.  Perfect.

5          Okay.  Can the Court, see my screen?

6          THE COURT:  Yes, we can see it.

7          MR. HAFT:  I'm sorry.  We can't see anything here.

8          MR. RAIKHELSON:  Oh, you've got to turn that off, I

9   think.

10         THE COURTROOM DEPUTY:  You are correct.

11         MR. RAIKHELSON:  Do I need to push something?

12         THE COURTROOM DEPUTY:  I just have to publish this

13  computer.

14  BY MR. RAIKHELSON:

15  Q.  Miss Panova, can you see my screen?

16  A.  Yes.

17  Q.  Okay.  What I'm showing you and what I am showing the Court

18  is an excerpt from Exhibit A, which is Docket Entry 18-1, which

19  has been admitted into evidence.

20      And this is the part that the opposing side has highlighted

21  in their complaint and it says:

22      "Right now we need to be especially careful with, quote

23  unquote, charitable organizations that help asylum seekers on

24  the U.S./Mexican border, including *Bridge v. U.S.A TVK* and Mil

25  Mujeres use fraudulent schemes."
```

1      What were the fraudulent schemes that you were everything

2  to?

3  A.   **Well, first of all, not as a fact that they recruit clients**

4  **(inaudible) in Telegram, which is a (inaudible) network and**

5  **they advertise it as well.**

6  Q.   How do you know that?

7  A.   **We have reports from people who found them in (inaudible)**

8  **and they are advertising and as well, I guess you could see**

9  **visually see that in some of the (inaudible) specific for**

10  **(inaudible).**

11  Q.   Okay.  And what about that is a fraudulent scheme?  Can you

12  please elaborate a little bit more?

13  A.   **So, first of all, there is an (inaudible) and second, I**

14  **guess there is I guess (inaudible).**

15      **So, first of all, when there's another thing (inaudible)**

16  **between the lawyer providing legal services and a (inaudible)**

17  **who is -- and he is (inaudible) seeking asylum in Mexico**

18  **(inaudible).  We see that that may be something that is**

19  **(inaudible).**

20      **And second, we know for a fact that (inaudible) working**

21  **with (inaudible) groups and giving them referral fees for every**

22  **client that they bring.  And also --**

23  Q.   You said you know that for a fact.  Let me stop you.  You

24  said you know that for a fact.  How do you know that for a

25  fact?

1  A.  **Well, the (inaudible) for this group for asylum seekers**

2  **told me in a conversation that indeed is a practice and they**

3  **(inaudible).**

4  Q.  And what's the name of that person?

5  A.  **Well, she -- she is (inaudible) and I am not quite sure of**

6  **his last name because of the nature of the (inaudible) asylum**

7  **seekers -- (inaudible) as well.**

8       MR. HAFT:  Your Honor, I understand there is relaxed

9  Rules of Evidence here, but this is --

10       THE COURTROOM DEPUTY:  Use your microphone.

11       MR. HAFT:  I object to this line of testimony as

12  hearsay.

13       THE COURT:  Overruled based upon my earlier rulings

14  that I admitted all of your hearsay.

15       MR. HAFT:  That's perfectly fine, Your Honor.

16  BY MR. RAIKHELSON:

17  Q.  Okay.  So Roma told you -- and how did you contact this

18  individual Roma?

19  A.  **So I -- in this Telegram and for asylum seekers and we**

20  **chatted a bit and Roma told me that they had (inaudible) with**

21  **lawyers and he quoted (inaudible) as one of his clients that**

22  **has been working with him that they provide asylum seekers to**

23  **the lawyers and lawyers get -- law firms give back to them for**

24  **every client that signs up.**

25       **And then, which was slightly weird to be exact what was**

1 **sharing asylum seeking information and whether the asylum**

2 **seeker (inaudible) signing a contract with a nonlawyer a**

3 **(inaudible) lawyer which was (inaudible).**

4 Q.  Okay.  So what you detail as a fraudulent scheme is a

5 scheme of kickbacks between lawyers and Mil Mujeres and asylum

6 seekers, correct?

7 A.  **Yes.**

8 Q.  Okay.  And that goes to the second article that I am going

9 to share.  Okay.  This is what has been admitted as Exhibit B,

10 Docket Entry 18-2.

11     Miss Panova, can you see my screen?

12 A.  **Yes, I can.**

13 Q.  Okay.  And this is an article from your website, correct?

14 A.  **Yes.**

15 Q.  Okay.  And then it says new scammers on U.S./Mexican border

16 Mil Mujeres Foundation already threatening Rubic.

17     Can you tell me what the substance of this article is,

18 generally?

19 A.  **Yes.  First of all, (inaudible) publisher of (inaudible)**

20 **and (inaudible) I received investigations in our (inaudible).**

21 **So this article was pretty very straightforward.  It was**

22 **published after our contact with Mil Mujeres because we hadn't**

23 **published articles before (inaudible).**

24     **So contact us with threats and they told us that if we**

25 **don't take down the mention of the names in other articles they**

1    going to sue us.  And they told us we don't have any resources

2    and they do have resources and that's why we should take down

3    the other articles and other (inaudible).  They were just

4    (inaudible) one of the participants (inaudible) U.S./Mexican

5    border.

6         So this article is very factual.  We were just quoting --

7    we were just saying we are showing screen shots of the website.

8    We are showing that they are, indeed, a nonprofit registered in

9    Washington, D.C. or actually saying that this nonprofit is

10   (inaudible).

11        Website in all the (inaudible) documents says that they

12   were established on all victims of domestic violence and Latina

13   women in the D.C. area and all of a sudden they (inaudible)

14   asylum seekers in Mexico seeking asylum in the United States,

15   which was slightly weird to us because normally that is not how

16   nonprofits function.  They have a specific audience in which

17   (inaudible) mission is very important for nonprofits.  They

18   stick to that and they don't change that.

19        If the war started (inaudible).  So that was something that

20   we mentioned in specifically not saying it is wrong, but they

21   said something that is (inaudible) to us.  Then we also

22   mentioned from an anonymous source that contacted with us and

23   we showed the screen shots of this source contacting Mil

24   Mujeres and --

25   Q.  Well, let's take a step back, Katerina.

1     The screen shots that I am showing, the first claim that

2 you are making that the Plaintiff has a problem with is -- and

3 I am going to quote this for you.  This is from their

4 complaint:

5     "The article claims that Mil Mujeres organizes persons to

6 serve as guarantors for a fee."

7     And when you wrote this article you relied on this screen

8 shots to prove the truthfulness of that, correct?

9 A.  **Yes.  (Inaudible) the source of indeed contacted Mil**

10 **Mujeres for the very first time and wanted to seek legal**

11 **services, but to seek U.S./Mexican border.  That was the first**

12 **thing that a witness asked Mil Mujeres.  Can you provide**

13 **(inaudible).**

14 Q.  And is that individual Yanina (inaudible)?

15 A.  **It is.**

16 Q.  Okay.  Very well.

17         THE COURT:  Can you say that name again?

18         MR. RAIKHELSON:  Yanina (inaudible), the other

19 individual in the breakout room or in the waiting room.

20 BY MR. RAIKHELSON:

21 Q.  Okay.  Now the second claim is that Mil Mujeres does not

22 practice law with licensed attorneys who can even come to

23 court.  Have you ever made that claim?

24 A.  **No.  Actually the article mentions they are nonprofit.**

25 **Also we mention that (inaudible) publish on this article the**

1  website is different than it is now.  So we took screen shots

2  of the website and we (inaudible) for the website we only can

3  locate one Russian speaking lawyer who is working for them and

4  that was (inaudible).

5       And we also mentioned that (inaudible), who is most likely

6  a paralegal working for Mil Mujeres, we asked her was whether

7  -- who does she work with and which lawyers are, (inaudible),

8  you know, like she's assistant to and she wouldn't answer.

9  Q.   Okay.  So it was your position that Natalia (inaudible) is

10 not an attorney, correct?

11 A.   I wasn't quite sure.  Actually I kindly asked (inaudible)

12 who called me and told me that she was working for Mil Mujeres.

13 And she actually give us a statement or have a conversation to

14 explain.

15      And I was very open and I asked her specifically to -- for

16 us to have conversation and clear things up for us to

17 (inaudible) to be able to show them their position in the

18 article saying never come back to us and she was extremely rude

19 and (inaudible).

20 Q.   Understood.

21      Okay.  And the only Russian speaking individual that is

22 there is someone named Olga Koloditskaya, correct?

23 A.   To the best of my knowledge, (inaudible) publish this

24 article is what we figured out from the website her name and

25 last name (inaudible) she is a Russian speaker.

1  Q.   And you would agree with me that Olga Koloditskaya on her

2  D.C.  web profile does not list Mil Mujeres as an employer or

3  anyone else?

4  A.   **Exactly.  There was not (inaudible) because anybody can**

5  **publish anything on the internet.  So like (inaudible) somebody**

6  **else who starts a website and said, hey, this lawyer is not**

7  **working for us and, you know, people would assume that this is**

8  **a law firm.  You know, what I mean?  So it was slightly**

9  **disturbing as well.**

10 Q.   Okay.

11 A.   **I also wanted to add in this article we (inaudible), which**

12 **told us the thing looks weird and alarming because lawyers are**

13 **not supposed to (inaudible) provide for the U.S./Mexican border**

14 **for money.  And in this case a (inaudible) was provided and was**

15 **supposed to (inaudible).  It's supposed to be a person who**

16 **knows you personally and guarantees you and is (inaudible).  So**

17 **it seems like (inaudible).**

18 Q.   Understood.

19      Okay.  On to Exhibit C, which is Docket Entry 18-3, when

20 was this part published?

21 A.   **It was published in February of 2023.**

22 Q.   Okay.  And this was not published by you individually, but

23 it was published by someone named Demetrie (inaudible),

24 correct?

25 A.   **It was (inaudible), correct.**

1  Q.  Isn't it a fact that all of these articles are published on

2  Rubic and to the extent that you wrote any of these articles,

3  you were acting as an agent of Rubic?

4  A.  **Yes.  (Inaudible).**

5  Q.  Okay.

6        THE COURT:  Can you ask her to explain what Rubic is?

7        MR. RAIKHELSON:  Yes.

8  BY MR. RAIKHELSON:

9  Q.  Miss Panova, can you please explain to the Court what Rubic

10  is?

11  A.  **Yes.  Rubic is a media website for Russians in the United**

12  **States.  We have a large audience of almost two million people.**

13  **We have articles and videos and (inaudible).  And we also known**

14  **GMAs (phonetic) and anyone can get a free consultation of**

15  **immigration lawyer.  Like maybe twice or three times a month.**

16  **So (inaudible) immigrants succeed in the states.**

17        **And then, myself, I came from Ukraine and the (inaudible)**

18  **system is complicated and the immigration law was never y**

19  **complicated.  So my mission here is to help immigrants just to**

20  **understand immigration law and not break the laws and succeed**

21  **in the states.  And we publish articles about immigration scams**

22  **(inaudible) and there are a lot of them.**

23        **And also, publications helps our, you know, investigation**

24  **to the Government to help with the immigration process.**

25  Q.  Okay.  Now, when you with have this, it says:

1      "But the Russians by hook or by crook successfully find

2   ways to bypass all obstacles often contacting helpers on the

3   Mexican border.  The scammers charge thousands of dollars for

4   ostensible border crossing assistance or as payment for

5   consultation supposedly designed to make interviews with

6   immigration officers successful."

7      Now one of these -- well, are you saying that Mil Mujeres

8   is part of this group of scammers?

9   A.  **We are definitely saying that the industry of border**

10  **helpers has made at least 60 million dollars since the war in**

11  **Ukraine started.**

12     **And most of the clients are, you know, people who are**

13  **seeking asylum on the U.S./Mexican border and they have money**

14  **and, you know, it's a huge business and we don't know any**

15  **reputable lawyers who are (inaudible) asylum in Mexico, I would**

16  **say that.**

17  Q.  Well, let me just see if we can break this down even more

18  because the amended complaint, which has been admitted as an

19  exhibit, says the third article reinforces the false statement

20  that Mil Mujeres sometimes somehow act as scammers or crooks in

21  the context of providing immigration legal services.

22     Do you state specifically Mil Mujeres are scammers and

23  crooks?

24  A.  **No, we don't.  We actually this article about the**

25  **(inaudible) says that for one third of asylum seekers that are**

1  **using the (inaudible) app are actually Russians as opposed to**

2  **what you would expect -- you would expect people (inaudible)**

3  **but actually most of the people can take (inaudible) the legal**

4  **wait for asylum in the United States are Russians, which is**

5  **interesting.  That's why (inaudible) and objection that the**

6  **(inaudible) the system.**

7  Q.  So you are talking about the industry and, you know, if you

8  talking about the industry and not specifically Mil Mujeres,

9  correct.

10 A.  **This is not only Mil Mujeres.  Actually the four articles**

11 **says part of this lawsuit only one involved Mil Mujeres and**

12 **part of the three involve other actors other than Mil Mujeres.**

13 Q.  Okay.  So which one was about Mil Mujeres and which -- so

14 this one isn't about Mil Mujeres?

15 A.  **It is not.**

16 Q.  Let me strike that.

17    If I type in Mil Mujeres, would you agree with me that

18 there was no search found, no exact match found?

19 A.  **(Inaudible) article.**

20 Q.  Now, just to test my computer to see if -- we see the word

21 running with obstacles, right, on the top?  Miss Panova, yes?

22 A.  **Yes.**

23 Q.  Okay.  If I put in running I get nine hits; running with

24 obstacles and it highlights that.  Do you see that?

25 A.  **Yes.**

1  Q.   Okay.  Is the only article that mentions Mil Mujeres

2  article -- I'm not talking about YouTube videos, but is the

3  only article that mentions Mil Mujeres the first one?

4  A.   **Yes.**

5  Q.   No other ones?

6  A.   **I believe so.**

7  Q.   Okay.

8  A.   **We have not published any articles about (inaudible).**

9  Q.   Okay.

10  A.   **This is (inaudible) another immigration scam.**

11  Q.   Miss Panova, hold on one second.  Let me just get through

12  the formalities.  What I am showing the Court is Exhibit D that

13  has been admitted and this is Docket Entry 18-1.

14      All right.  Now what is:  Beware of (inaudible) how regular

15  scammers turn out geniuses and (inaudible), is this about Mil

16  Mujeres?

17  A.   **Well, she mentions twice inaccurate (inaudible), but it is**

18  **not about Mil Mujeres.**

19  Q.   Okay.  But it mentions Mil Mujeres, correct?

20  A.   **Yes.  It mentions only players, major players in the -- on**

21  **the U.S./Mexican border, which are making money for asylum**

22  **seekers.**

23  Q.   Okay.  And do you see a difference between Mil Mujeres,

24  Inc. and Mil Mujeres Legal Services?  Do you know if there is a

25  difference between those two entities?

1  A.  **I am not aware of that and (inaudible).**

2  Q.  Okay.  Would you agree with me that based on your research,

3  Mil Mujeres, Inc. is not a law firm?

4  A.  **I am not quite sure.  (Inaudible) Mil Mujeres, Inc., I just**

5  **went to the website, which is the website of the nonprofit and**

6  **the (inaudible) lawyers and that's exactly what (inaudible).**

7  **So I didn't concentrate on (inaudible).**

8  Q.  Okay.

9  A.  **Not actually stated that we (inaudible) lawyer on the**

10  **website and we also mentioned that we checked that they are**

11  **indeed a nonprofit registered in the State of Washington, D.C.**

12  Q.  Now, this article mentions that licensed lawyers and

13  employees of the U.S. Government immigration authorities are

14  authorized to provide immigration services, correct, or is that

15  not true?

16  A.  **Yes, it is correct.**

17  Q.  Okay.  And is that based on your personal belief?

18  A.  **I think it was a fact and I know for a fact that unlicensed**

19  **people cannot practice law in the United States.  It is**

20  **illegal.**

21  Q.  Okay.  So only attorneys can represent individuals in front

22  of immigration court?

23  A.  **Yes.  Exactly.  And also we don't want our audience, who we**

24  **care deeply, being represented by people who wouldn't have**

25  **their best interest at heart and wouldn't be (inaudible).**

1  Q.   Okay.

2  A.   **(Inaudible) cannot.**

3  Q.   Okay.

4  A.   **(Inaudible) not attempts to immigration fraud.**

5       **And as we know there are at least three lawyers who were**

6  **arrested last year in our Russian speaking community who were**

7  **also involved in immigration scams.  All of them from New York**

8  **City and immigration scam can have lots of (inaudible) for two**

9  **years practicing law without a license.**

10      **But just like (inaudible) nothing for them and spoil their**

11 **whole life, but sometimes these are (inaudible) lawyers as**

12 **well.  You know, as we can see there are (inaudible) people who**

13 **were making asylum claims and making non(inaudible) people**

14 **(inaudible) in order to get asylum.  So this happens in our**

15 **community and we know for a fact and we have been covering with**

16 **FBI to kind of help them as well.**

17 Q.   Okay.  Let me share my screen with you and show you what

18 has been marked as, I believe this is Docket Entry 18-6.  I

19 believe this is Exhibit -- I'm scrolling up really quickly --

20 Exhibit F?

21 A.   **Yes.**

22 Q.   Okay.  I am going to make the representation to you that

23 this is the translation of your YouTube video.  Okay.  And the

24 first or the second line says:

25      "Mil Mujeres nonprofit is currently suing us."

1      So would you agree with me that, number one, you mention

2 that Mil Mujeres is indeed a nonprofit and this happened, this

3 video occurred after you were already being sued?

4 A.   Yes.  Actually, the video to warn our public and our

5 audience that we were being sued because I think we are very

6 open and transparent with our audience.

7      And I guess that's why they really value us and our source

8 of information.  So I thought it made sense to me to share this

9 piece of information that we are being sued.

10 Q.   Okay.  Do you remember what the substance of the YouTube

11 video was about?

12 A.   Yes.  I just matter of fact read some of the lawsuits

13 (inaudible) and received some of the documents from the

14 lawsuits and adjust my personal opinions that I think that, you

15 know, what they are involved with, essentially is immigration

16 fraud.

17      And that they also stated in their lawsuit that they have

18 some clients, potential clients who came to them and told that

19 they saw article and they had doubts about them.

20      And I stated in the video that it is exactly why I want

21 people to have doubts about them because people should be

22 doubting immigration law providers.

23      And I would be really happy that (inaudible) become the

24 clients because it is my personal opinion that they don't have

25 the immigrants' best interest at heart.

1  Q.   Okay.  So you were essentially making a public service

2  announcement and saying, listen, be careful who you work with

3  because you don't want vulnerable immigrants' to get roped into

4  potential scams?

5  A.   **Well, and also (inaudible).  They might see somebody else.**

6  **A client of theirs who didn't hire them or didn't pay them, or**

7  **something, if they see me they are going to see (inaudible) and**

8  **(inaudible).**

9       **So I just wanted to warn people that these guys (inaudible)**

10  **and do to you as they did to me, saying, oh, we didn't know you**

11  **have the resources and we do have money for lawyers and we are**

12  **going to sue you and (inaudible) more money.**

13  Q.   Okay.  All right.

14  A.   **(Inaudible) for the public and my audience are immigrants**

15  **and so that's what I do.**

16  Q.   Very well.  Then, I will turn you over to

17  cross-examination, then.  Thank you.

18          THE COURT:  Cross?

19          MR. HAFT:  Yes, Your Honor.  If I could work from the

20  podium if that's all right.

21          THE COURT:  That's fine.

22          MR. HAFT:  You are more than welcome to use my

23  computer.

24          THE COURT:  While he is getting ready, Miss Panova, do

25  you own the Rubic website.

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  So you run the day-to-day operations?

3          THE WITNESS:  Yes, I do.

4          THE COURT:  And can you tell me what is the purpose of

5    the Rubic website and what is its audience?

6          THE WITNESS:  Immigrants; most are audience in the

7    United States already.  Plus we have audience who is about to

8    immigrate.  So they might be from other countries.

9          And also, since we are banned from Russia and attacked

10   by Russian special forces, since we are big -- we a big -- our

11   is audience big, but (inaudible) struggling as media company as

12   well.  Yes, that's what we are and (inaudible) the owner of a

13   small media company and we have helped lots of immigrants' just

14   by articles and videos.

15         THE COURT:  I see.  And do you consider yourself a

16   journalist?

17         THE WITNESS:  I am a professional journalist.  I have

18   worked with journalists for many years.  I received full

19   (inaudible) to study journalism in the United States as a

20   common grounds, which I received from the U.S. Embassy in

21   Ukraine.  I have a Master's Degree in Journalism.  I also have

22   a non degree from New York in Journalism that's what I did all

23   my life.  I'm a journalist, yes.

24         THE COURT:  Okay.  Thank you.

25                          CROSS EXAMINATION

BY MR. HAFT:

Q.   Ma'am, just to clarify, you had testified earlier that your website has approximately two million viewers; is that correct?

A.   **Not only the website.  My website has 1.7 viewers -- many users and we also have social media channel like YouTube and Tiktok, newsletters and (inaudible).  And so that's in the (inaudible) that counts for the two million people.**

Q.   So is it fair to say that the articles and information published either on your website or through your social media, it is read by upwards of two million people?

A.   **No.  Each article is not read by two million people.  We know exactly how many viewers every article has using (inaudible).**

Q.   Ma'am, you testified earlier that you are the publisher of Rubic; is that correct?

A.   **Yes.**

Q.   Do you approve the publishing of any of the articles that appear on the website?

A.   **I don't approve all articles, no.  Some of them.**

Q.   Well, can you give me an example of an article that you would approve versus one that you wouldn't?

A.   **When I think the article is a difficult piece that is worth my time and attention and maybe a journalist needs another set of eyes that would be (inaudible).**

Q.   Okay.  Ma'am, before an article is published, do you

```
 1  independently verify the information that is contained within
 2  such an article?
 3  A.   Yes.  We have a very, you know, tight regulation process.
 4  Professional (inaudible) and people who work in the office and
 5  with us and we have additional guidelines and ethical
 6  (inaudible) and stuff like that.
 7  Q.   Okay.  So, ma'am, if I could direct your attention to the
 8  first article we were discussing, which I believe was Docket
 9  Entry 18-1, the January 26th of 2023 article.
10        Do you know the article I am referring to?
11  A.   I do not --
12            MR. RAIKHELSON:  Your Honor, it is not in front of
13  her, but I am happy to share the article with her.
14            THE COURT:  You could -- well, I will leave it to you
15  since it is your examination, but if you like --
16            MR. HAFT:  I am not going to have any other way -- if
17  you have a way of posting it I would appreciate it.
18            MR. RAIKHELSON:  No problem.  Is this the article,
19  18-2, Exhibit B?
20            MR. HAFT:  18-1.  I'm sorry.
21            MR. RAIKHELSON:  18-1.  Okay.  18-1, Exhibit A.
22            MR. HAFT:  That's correct.
23  BY MR. HAFT:
24  Q.   Ma'am, is that your name that appears at the top of this
25  article prior to the title?
```

```
 1  A.  It is not.

 2  Q.  That is not.

 3      So who is Nada Panova (phonetic)?

 4  A.  She's a journalist.

 5  Q.  She's a journalist.

 6      And ma'am, what is your full name?

 7  A.  Katerina.

 8  Q.  And your last name?

 9  A.  Panova.

10  Q.  Do you have any relation to this person?

11  A.  I do not.

12  Q.  So can you just walk me through briefly what it is that you

13  did to verify the information that is contained in this

14  article?

15  A.  Well, this article contains information of the arrests of

16  an immigration lawyer in Brooklyn.  So we have four documents

17  (inaudible) and also information from (inaudible).

18  Q.  Have you independently verified all that information?

19          MR. RAIKHELSON:  Your Honor, I object to the question.

20  This article and the question has nothing to do with Mil

21  Mujeres.  This is about a lawyer that is not even an employee

22  of Mil Mujeres or even a contractor of Mil Mujeres.

23          THE COURT:  Overruled.

24  A.  I don't understand what it means to --

25  BY MR. HAFT:
```

1  Q.   Well, ma'am, I'm asking --

2  A.   **About a person who I think admitted in court that she is**

3  **guilty of --**

4  Q.   Ma'am, you testified a few minutes ago that you, as the

5  publisher, review articles before they are posted.

6      Was this an article that you personally reviewed before it

7  was posted on your website?

8  A.   **No.**

9  Q.   No.  So did you independently verify the information

10  contained in this article?

11  A.   **I did not.  But my journalist surely did.  This was a case**

12  **that was like going on for one and-a-half years, this specific**

13  **case, in which FBI was involved in this case.  So I didn't**

14  **personally do, but my journalist do their job.**

15  Q.   So, ma'am, sitting here today can you testify with

16  certainty that all the information contained within this

17  article is one hundred percent truthful and accurate?

18  A.   **Yes.**

19  Q.   And how can you do that since you just testified that you

20  didn't independently verify the information?

21  A.   **I have (inaudible) and that's how I know.  Everything that**

22  **is published is (inaudible).**

23  Q.   I see.  So, ma'am, let's turn to Exhibit B, 18-2.

24          MR. HAFT:  If you can scroll down?

25          MR. RAIKHELSON:  Yes.  18-2.  Any particular place you

1  want me to scroll?

2         MR. HAFT:  Yes.  Just go down to the first page.

3         MR. RAIKHELSON:  Going down to the first page.

4         MR. HAFT:  Perfect.

5  BY MR. HAFT:

6  Q.   Ma'am, I believe you testified earlier that it was your

7  belief that only one of the articles cited in the Plaintiff's

8  complaint was in reference to Mil Mujeres; is that correct?

9  A.   **Yes, it is.  This particular article that is on the screen**

10 **right now is an article about Mil Mujeres.**

11 Q.   Okay.  And this article, likewise, is written by the same

12 author as the article that you are discussing, Nada Panova; is

13 that correct?

14 A.   **Yes.**

15 Q.   So, ma'am, did you independently verify the information

16 contained in this article as well?

17 A.   **I believe that Nada did, yes.**

18 Q.   Where is Nada (inaudible) right now?

19 A.   **She's right now in Ukraine.**

20 Q.   So, again, you have no idea whether the information

21 contained in this article is actually pure and correct?

22         MR. RAIKHELSON:  Objection; misstates witness'

23 testimony.

24 A.   **Actually --**

25         THE COURT:  Miss Panova, when there is an objection

 1  you have to wait for me to give a ruling.

 2          So what is your objection again?

 3          MR. RAIKHELSON:  Misstates witness' testimony.

 4          THE COURT:  Overruled.  You can answer.  Go ahead ask

 5  the question again and let the witness answer it.

 6  BY MR. HAFT:

 7  Q.   Ma'am, did you independently verify the information

 8  contained in this article?

 9  A.   **We did.**

10  Q.   That wasn't my question, ma'am.

11       Did you personally, as the publisher, independently verify

12  the information contained in this article?

13  A.   **I'm sorry.  Can you explain what you mean personally as a**

14  **publisher?  Is it like you are talking to me like CEO or are**

15  **you talking to me like an individual?**

16  Q.   No, ma'am.

17       What is your job as the publisher of a media organization

18  or as a journalist?  What is it that you do exactly?

19  A.   **To keep the lights on.**

20  Q.   I'm sorry.  Can you repeat that?

21  A.   **To keep the lights on.**

22  Q.   This part of --

23  A.   **To give general guidance to our journalists.**

24  Q.   So explain the process to me of when this article is

25  submitted before it is published on your website.  Does Nada

1  Panova send the article to you first?

2  A.  **No, she did not.**

3  Q.  Did you review the information that is contained within

4  this article before it was published?

5  A.  **I did.**

6  Q.  Because a few minutes ago when I asked you if you

7  independently verified it, you said you didn't?

8          MR. RAIKHELSON:  Your Honor, objection; argumentative.

9          THE COURT:  You can answer the question.  Overruled.

10  A.  **I'm sorry.  I do not understand the question really.**

11      **And you are really -- it seems like you are picking on**

12  **parts or something.  I am just telling you that as a publisher,**

13  **I did not edit or look at every article that was publish**

14  **multiple articles a day.**

15      **Okay.  But in this particular instance this article was**

16  **indeed like, you know, I looked at this and the information**

17  **that was included in that and I was part of the process.  Like**

18  **I was advising the journalist, but I did not specifically, okay**

19  **it, or like edit it, or contributed prior to publication.**

20      **Does that answer your question?**

21  BY MR. HAFT:

22  Q.  Sure.

23      Ma'am, is this the article that you referred to earlier

24  where information was obtained from a gentleman named Roman?

25  A.  **No.  Actually conversations with Roman (inaudible) was not**

1  **included in this article.**

2  Q.  Which article did your conversation with Roman refer to?

3  A.  **It was not included in any articles yet.**

4  Q.  Well, ma'am, wasn't it your testimony earlier that the

5  source of your information about the alleged fraud being

6  conducted by Mil Mujeres came from Roman through a Telegram

7  group chat?

8  A.  **No.  Actually I thought that we were -- we had a witness**

9  **named (inaudible) who worked with Mil Mujeres and she blew the**

10  **whistle on that.  And that article also talked to Roman, who is**

11  **a Telegram chat admin and he told me that he was getting a**

12  **kickback to (inaudible), but we didn't publish that information**

13  **yet.**

14  Q.  I mean, when was the first time you spoke to Roman about

15  this alleged kickback scam, ma'am?

16  A.  **It was after the article was published.**

17  Q.  So where did the information from this article come from

18  then if you didn't speak to Roman until after its publication

19  on February 2nd of 2023?

20  A.  **Well, this article does not contain any information about**

21  **the kickback.  It does contain other information, which led us**

22  **to these Mil Mujeres immigration imposters.**

23  Q.  Well, ma'am, would you admit that the title of the article

24  is loose scammers and U.S./Mexican border Mil Mujeres

25  Foundation?

1  A.  **Yes.**

2  Q.  So you would agree with me that the title implies that

3  Mil Mujeres is, in fact, running some type of scam?

4  A.  **Yes.**

5  Q.  But the scam you are referring to in this article is what

6  exactly?

7  A.  **Personal Mil Mujeres guarantors for asylum seekers and**

8  **guarantors can be offered for money Mil Mujeres are offering**

9  **guarantors for $800.  So you buy it guarantors (inaudible)**

10  **which is illegal.  Second, this is something that we believe or**

11  **like it led us to believe that Mil Mujeres is (inaudible)**

12  **immigrant (inaudible).**

13  Q.  Okay.  Ma'am, where did you obtain the information

14  regarding the guarantors, as you refer to them?  Who did that

15  come from?

16  A.  **From the communications that our witness had with Mil**

17  **Mujeres specifically was (inaudible).**

18  Q.  So, this sole source of information is your witness Yanina

19  for this article; is that correct?

20  A.  **No, it is not the sole source of information, but it is the**

21  **sole source of information that we published.**

22  Q.  Well, what other sources of information do you have that

23  you relied upon in publishing this article?

24  A.  **Well, we used the website of Mil Mujeres to like, you know,**

25  **to a mission to help victims of domestic violence of Latina**

1  women in the D.C. area and didn't correspond to -- well,

2  actually, they are doing.  So this is another fact that we used

3  as one of the decisions they are (inaudible) actors.  Like

4  nonprofit all of a sudden.  Like you have one mission and then

5  all of a sudden when there is war there is money to be made and

6  then becomes another thing entirely that (inaudible).

7      So that also led us to believe that they are immigration

8  imposters.  So first we had this information that they

9  (inaudible) guarantors, which is (inaudible).  Second, that

10  they are working on one mission and then working entirely from

11  (inaudible).

12      And third, the way (inaudible) was their plans in an

13  anonymous Telegram group and then sharing the information with

14  other non lawyer people about their potential plans led us to

15  believe that that is some that, you know, guarantors wouldn't

16  do.

17  Q.  Ma'am, just so I am clear, are you suggesting that because

18  Mil Mujeres was originally formed to help Latina women flee

19  from domestic violence that it is prohibited from helping other

20  groups of immigrants at any point in time?

21  A.  No, I am not suggesting that.  But I am suggesting that

22  (inaudible) led us to believe that they are indeed doing some

23  immigration fraud.

24  Q.  Right.  But when I just asked you what type of acts you

25  were considering immigration fraud, you cited to the fact that

1  the organization was formed as a nonprofit to help Latina women

2  flee from violence; isn't that correct?

3  A.  **Well, it is not my position.  It is your position was**

4  **formed.  It is actually your client.  So Mil Mujeres was formed**

5  **as a nonprofit to help Latina women in the D.C. area victims of**

6  **domestic violence.**

7  **So it let's me know that (inaudible) nonprofit all of a**

8  **sudden changes what they are doing and the employees in there.**

9  **It might be the case that it was kind of like (inaudible) based**

10 **on somebody who is just using a nonprofit as a way to avoid**

11 **taxes.**

12 Q.  Ma'am, are you suggesting that it is illegal for a

13 nonprofit to help other groups of immigrants?

14 A.  **I don't see that.**

15     MR. RAIKHELSON:  Asked and answered and misstates

16 witness' testimony.

17     THE COURT:  Overruled.

18 A.  **I never suggested that.**

19 BY MR. HAFT:

20 Q.  Well, ma'am, you just stated a few minutes ago that one of

21 the fraudulent acts that you are reporting on was that Mil

22 Mujeres was formed in 2017 to help Latino women and now is

23 helping other groups of immigrants.

24     Was that not your testimony a few minutes ago?

25 A.  **I didn't suggest it was a fraudulent act.  I was told that**

1  **this was something which raises red flags.**

2  Q.   What about that raises a red flag to you, ma'am?

3  A.   **Well, I guess I explained it before.**

4  Q.   Well, ma'am, in 2007 when Mil Mujeres was originally formed

5  as a 501(c)(3), was there an act of a war in the Ukraine going

6  on?

7  A.   **No.  To answer your question there was no war in Ukraine**

8  **since 2007.**

9  Q.   Ma'am, within this same article --

10        MR. HAFT:  I guess, Counsel, would please scroll down

11  a little bit more to the third page of it.

12        MR. RAIKHELSON:  Third page?

13        MR. HAFT:  Yes.

14        MR. RAIKHELSON:  This is the third page.  Is that what

15  you --

16        MR. HAFT:  Next page.

17        MR. RAIKHELSON:  Here?

18        MR. HAFT:  Yes, thank you.

19        MR. RAIKHELSON:  Okay.

20  BY MR. HAFT:

21  Q.   Ma'am, you are referencing -- it says our refugee.  Do you

22  see that paragraph of them referring to you right above the

23  screen shot?

24  A.   **I do.**

25  Q.   And who is the person that you are referring to in this

1  paragraph as your refugee?

2  A.   **Yanina which is witness.**

3  Q.   And the information that is contained within this

4  paragraph, as far as a guarantee and a reference to the $400

5  for additional documents, that's all from Yanina?

6  A.   **It is from multiple sources, but Yanina was the one who**

7  **provided us the screen shots, which actually proves that and it**

8  **is not guarantee (inaudible).**

9  Q.   Ma'am, who are the other sources besides Yanina?

10 A.   **I am not actually allowed to even tell you about my**

11 **sources.   Unless ordered to by Court, I would not be able to do**

12 **that.**

13 Q.   Well, ma'am, did you actually speak to these sources before

14 you published this information?

15 A.   **We did.**

16 Q.   No.   Did you personally speak to these sources before you

17 published this information?

18          MR. RAIKHELSON:   Objection; asked and answered.

19          THE COURT:   She said she did and then the followup was

20 did this witness personally.

21          So I take it your answer is, yes, you did?   You

22 personally spoke to the sources?

23          THE WITNESS:   I spoke to Yanina, who is the witness

24 and who is the source of the screen shots, but I personally did

25 not speak to all the witnesses that we talked to (inaudible),

1  but I spoke to some.

2            THE COURT:  Okay.  Go ahead.

3  BY MR. HAFT:

4  Q.   Approximately how many sources are you talking about?

5  A.   **I don't feel comfortable exposing this information.  It is**

6  **protected sources.**

7  Q.   So you can't identify them by number without identifying

8  their identities?  Is that what you are stating here?

9  A.   **No, I am just stating I would rather not tell you how many**

10 **witnesses we talked to just because it will -- it might effect**

11 **-- it might effect the trusts that our audience puts in my**

12 **publication.  Unless I am obligated by, you know, Your Honor to**

13 **do that, I would rather not tell that.**

14 Q.   I see.  And ma'am, these screen shots that you are

15 publishing here, who are these supposed to be between?

16 A.   **Well, they are not supposed to.  They are between Mil**

17 **Mujeres and (inaudible) who is a witness present in the court**

18 **today.**

19 Q.   Well, where is that information shown here on these screen

20 shots?

21 A.   **This is Telegram (inaudible) Mil Mujeres the client to**

22 **(inaudible) 17 years.**

23 Q.   Okay.  That may be so.  But, ma'am, where on these screen

24 shots does it reflect that this has anything to do with Mil

25 Mujeres other than the fact that it is published within an

article that you wrote about them?

A.  **Well, you see, we have a translation of the interaction between (inaudible) and Mil Mujeres and (inaudible).**

**This is a website which you can see it on the screen shot that Mil Mujeres and it says in Russian this is a website of our company.  So going to assume employee would write that. (Inaudible) not to Mil Mujeres.**

Q.  I don't know, ma'am.  You are the one who published it in the article.  So I am asking you --

MR. RAIKHELSON:  Your Honor, objection; argumentative.

THE COURT:  See if you can answer the question.  What is the question?

MR. HAFT:  I am just simply asking about what the source of this screen shot was and how it was authenticated.

A.  **Well, it was (inaudible) who is witness to this Court today and she will testify if you are interested in her testimony in terms of who did you talk to and what was your experience of Mil Mujeres.**

MR. HAFT:  Your Honor, if I may, I would like to -- have you admitted both of your exhibits so far?

MR. RAIKHELSON:  No.

MR. HAFT:  Defendants' Exhibit A is a certified translation of these purported text messages that are cited in this article.  We are on the Defendants' Exhibit list.

I would like to rely on those for impeachment purposes

1  here if Your Honor will allow me.  I know they are not admitted

2  into evidence yet.  They are on the Defendants' exhibit list.

3          THE COURT:  Any objection?

4          MR. RAIKHELSON:  Well, they are being used for

5  impeachment purposes.  I don't know what I would be objecting

6  to.  No one is moving them into evidence.

7          MR. HAFT:  Not yet.

8          THE COURT:  No objection.  Go ahead.

9          MR. HAFT:  Are you able to provide her those as well?

10         MR. RAIKHELSON:  Probably not.  I'll go into the

11  docket and actually I might not even need to do that.

12          Is this what you are talking about?

13         MR. HAFT:  Yes, thank you.

14  BY MR. HAFT:

15  Q.  Ma'am, the screen shot that is in front of you through

16  Telegram, do you recognize this Telegram?

17         THE COURT:  Before you answer, just so the record is

18  clear, can you identify this exhibit something from the Exhibit

19  list?

20         MR. HAFT:  Certainly, Your Honor.

21         THE COURT:  It is something from the exhibit list?

22         MR. HAFT:  It is Defendants' Exhibit A.

23         THE COURT:  Defendants' Exhibit A and does it appear

24  somewhere in the docket?

25         MR. HAFT:  It is 29-1 maybe.

```
 1            THE COURT:  All right.  Go ahead.
 2  BY MR. HAFT:
 3  Q.   Okay.  Ma'am, if I could direct your attention to the first
 4  page of the text at the bottom.  There's an article cited, a
 5  Telegram, a U.S./Mexico article.
 6            MR. HAFT:  If you could turn that around, Counsel.
 7            Thank you.
 8  BY MR. HAFT:
 9  Q.   Ma'am, do you recall seeing --
10  A.   I don't recall.
11  Q.   I'm sorry?
12  A.   It's not -- it's not an article.  It's a link to a Telegram
13  channel.  It is not an article.
14  Q.   Ma'am, would you agree that this is the same link that is
15  included in the publication that we were discussing just a few
16  minutes ago?
17  A.   It is not the same link.
18  Q.   It's not the same link?
19  A.   It's not -- I don't understand the question.
20  Q.   Ma'am, is this the link, part of the same screen shot that
21  was included in your publication that we were just discussing a
22  few minutes ago with the Telegram?
23            MR. RAIKHELSON:  Objection.  The question is vague.
24            MR. HAFT:  I would like to go side-by-side if
25  possible, but it is not really feasible with the technology.
```

1            MR. RAIKHELSON:  What do you mean side-by-side?

2            THE COURT:  In other words, he wants to establish that

3     that actual link, the exact letters of that link, are the same

4     letters of the link that was in the article that was published.

5            MR. HAFT:  Your Honor, here is the problem.

6            And I will provide it to the Court if I can figure out

7     a way to do this I will be happy to.

8            There is a screen shot that is part of this

9     publication, which we contend the article itself is false in

10    the fact that -- the screen shot itself is a fabrication.

11           The screen shot chain, the Telegram chain, which is

12    provided as Defendants' Exhibit 19-1, is an actual

13    conversation.  If you follow along that conversation, you can

14    see where that conversation ends.

15           And then, what is actually included as part of the

16    screen shot is not part of this certified translation.  So I

17    could like to put that side-by-side and I think that would be

18    extremely useful and the Defendant is more than welcome to

19    explain the discrepancies between the two conversations.

20           THE COURT:  Well, I don't think technologically we can

21    do that, but we can toggle back and forth and you can show her

22    on this one and --

23           MR. HAFT:  I'm trying to and it seems to be getting

24    lost between the lines.

25           THE COURT:  Do your best.

```
 1  BY MR. HAFT:
 2  Q.  So, ma'am, let's look through the conversation that is part
 3  of Defense exhibit here between --
 4          MR. RAIKHELSON:  Do you want me to scroll through the
 5  conversation?
 6          MR. HAFT:  You can scroll down.
 7          MR. RAIKHELSON:  Is that what you want?
 8          MR. HAFT:  Yes, sure.
 9          THE COURT:  The translation.
10          MR. HAFT:  The translation.  Thank you.
11          MR. RAIKHELSON:  It is side-by-side.  So you have the
12  actual and you have the translation next to it.
13  BY MR. HAFT:
14  Q.  So, ma'am, is this the same Telegram information that was
15  published in your article that we have been discussing from
16  February 2nd?
17  A.  **This is not the same screen shot**.
18  Q.  I understand that.
19          But, ma'am, I am asking you to read through it and tell me
20  if parts of this screen shot or part of this conversation
21  appear on the screen shot that is part of your February 2nd
22  article?
23  A.  **Not entirely, no.  So you see the conversation was a**
24  **conversation that our witness Yanina had with (inaudible) of**
25  **Mil Mujeres.  So she was conversing on this messaging app and**
```

1 then that social network Telegram was provided for a while.

2      So part of her conversations were published in the article

3 about Mil Mujeres and seems at the time of the publication,

4 Yanina was not ready to, like, you know, provide names to be

5 published since she (inaudible).  You know, we blurred some of

6 the details including her name and the name of the (inaudible)

7 and some other details that might have identified her because

8 she asked for anonymity.

9      So the screen shot that we published are slightly modified

10 just to -- for the sake of preserving anonymity --

11 Q.   Sure.

12 A.   -- for Yanina.

13 Q.   Ma'am, can you just point out to me, though, in the full

14 translated chat on Telegram between your witness and Natalia

15 where there is any reference to payment of the $800 guarantee

16 or $400 for additional documents?

17 A.   So they are not in this translation because Natalia

18 actually is in conversation with, you know, actually

19 conversation with Natalia deleted those conversations because

20 she was about to cross the U.S./Mexican border.  She got

21 (inaudible) and she knew that there were lots of conversations,

22 but not all of them.

23      So she sent some of those screen shots to us prior to

24 crossing the U.S./Mexican border and then she deleted them.  So

25 what we have from her and what was published in the article are

1  the screen shots as we see from her.  And what you see in front

2  of you right now are screen shots that she did of the remainder

3  of the conversations that Yanina had with Mil Mujeres.  It was

4  done prior to this court.  You know, they were made in

5  preparation to this court.

6  Q.  I see.  So, ma'am, am I to believe that the entire

7  conversation that is included as Defendants' Exhibit A to

8  today's hearing is the full and complete Telegram conversation

9  between your witness and Natalia?

10  A.  It is not full and complete conversation.  I actually told

11  you the opposite of our witness deleted part of this

12  conversation because she was fearful that they might implement

13  her in some way.

14  Q.  I see.  So is it fair is to say, then, that the screen that

15  was published in your article, dated February 2nd, is an

16  incomplete version of a conversation that allegedly took place

17  between your witness and an employee of Mil Mujeres?

18  A.  First of all, I am not quite sure (inaudible) I just assume

19  that from (inaudible).  Second, I don't know if it was complete

20  or incomplete.  You will have to ask the witness here.

21  (Inaudible) what she is telling me.

22     And I think at the time of sending this conversation it was

23  complete.  Afterwards she had more conversation with Mil

24  Mujeres and I did not receive part of them.  I received what we

25  did have on her phone saved was the ones that we translated for

1  **this Court and you see on the screen right now.**

2  Q.   Okay.  Ma'am, who is David Trister (phonetic)?

3  A.   **He's an immigration lawyer in New York.**

4  Q.   Is an a licensed attorney in New York State?

5  A.   **He is.**

6  Q.   Are you sure about that?

7  A.   **Yes.**

8       MR. RAIKHELSON:  Objection; asked and answered and

9  argumentative.

10      THE COURT:  Overruled.

11  A.   **Yes, he is because we checked his immigration law license.**

12  BY MR. HAFT:

13  Q.   Ma'am, would it surprise you to learn that Mr. Trister is

14  not a barred attorney of New York State?

15  A.   **Well, you will have to show me some prove, I guess.**

16  Q.   Ma'am, would it surprise you to find out that Mr. Trister

17  is not a barred attorney in New York State; yes or no?

18      MR. RAIKHELSON:  Your Honor, it is argumentative and

19  it is irrelevant.

20      THE COURT:  Overruled.  She can answer that.

21  A.   **Yes, it would surprise me.**

22  BY MR. HAFT:

23  Q.   Ma'am, did you independently confirm with the New York

24  State Bar that Mr. Trister was a New York State licensed

25  attorney?

1  A.   **We checked on the New York Bar website and he also provided**
2  **us his license.**

3  Q.   Did you personally check the New York Bar website?

4       MR. RAIKHELSON:  Your Honor, this has been asked
5  multiple times.

6       THE COURT:  No.  She hasn't answered whether she
7  personally checked it.  It has been asked multiple times and it
8  hasn't been answered.

9  A.   **I believe so.  It was (inaudible), but yes, I checked his**
10 **license personally.**

11 BY MR. HAFT:

12 Q.   Ma'am, is it your responsibility as the publisher of this
13 website to assure accuracy as to the content of the articles?

14 A.   **As a manager, yes, I guess I am responsible.  But it is not**
15 **my responsibility to assure every one little detail.  It is the**
16 **responsibility of my employees.**

17 Q.   So sitting here today, ma'am, you can't testify with
18 certainty that Mr. Trister is actually a member of the New York
19 Bar; is that correct?

20 A.   **I can testify with hundred percent certainty that Mr.**
21 **Trister is indeed a licensed attorney.  I checked his Bar a**
22 **long time ago.  Maybe like six years ago or something, but I'm**
23 **a hundred percent sure that he is indeed a licensed attorney.**
24 **Maybe in New York or maybe in another state, but he is a**
25 **licensed attorney and I can tell you with hundred percent**

1  certainty.

2  Q.   Okay.  Ma'am, you would agree that this article expressly

3  states that he is an immigration lawyer with offices in New

4  York and New Jersey, correct?

5  A.   Yes.

6  Q.   But sitting here today you can't say with certainty that he

7  is actually licensed in either of those states at the time that

8  this article was published, correct?

9  A.   Well, actually, working (inaudible).

10      So it doesn't -- when we say that he is an immigration

11  lawyer with offices in New York and New Jersey is that -- it

12  doesn't entail this particular order has like, you know,

13  obligation to be licensed in New York or New Jersey.

14      They have an obligation to be licensed to be an immigration

15  lawyer and finished law school and stuff like that and took the

16  Bar exam, but not necessarily like, licensed in New York and

17  New Jersey because immigration law is (inaudible) special.

18  Q.   I see.  Ma'am, turning to the next page --

19          MR. HAFT:  Sorry, if you can turn back to the article

20  itself.

21          MR. RAIKHELSON:  Okay.  What's the exhibit again?

22          MR. HAFT:  It's 18-2.

23          MR. RAIKHELSON:  18-2.  Let me pull that up.

24          MR. HAFT:  No problem.

25          MR. RAIKHELSON:  Okay.  I have 18-2 up.  You said what

1  page?

2         MR. HAFT:  If you scroll down to the page that has the

3  attorney/client agreement on it.

4         MR. RAIKHELSON:  Are you talking about this page?

5         MR. HAFT:  Yes, perfect.  Thank you.

6  BY MR. HAFT:

7  Q.  Ma'am, where did you obtain a copy of this attorney/client

8  agreement that is published in this article?

9  A.  **It was sent to us by Yanina.**

10 Q.  And I believe you testified earlier that this agreement was

11 illegitimate and fictitious; is that correct?

12 A.  **I did not testify to that.**

13        MR. RAIKHELSON:  Your Honor, let the record reflect

14 that the attorney agreement is from Mil Mujeres Legal Services,

15 Inc which says that the attorney filed the Plaintiff in this

16 case is Mil Mujeres I think.

17        THE COURT:  Okay.  You can continue with your

18 questions.

19        MR. HAFT:  Thank you, Your Honor.

20 BY MR. HAFT:

21 Q.  Ma'am, what was the purpose of including this

22 attorney/client agreement in this publication?

23 A.  **We decided this information for our audience.**

24 Q.  What information specifically within this short agreement

25 is important for your audience?

1  A.  **All of it.**

2  Q.  Well, ma'am, why didn't you include the entire agreement,

3  then, if it was all important for your audience?

4  A.  **I believe it was maybe (inaudible) or something**

5  **(inaudible).  I am not quite sure why I -- see, contracts**

6  **itself is still (inaudible), I guess.  They may be just -- it**

7  **was like an honest mistake coming back to (inaudible) a picture**

8  **to --**

9  Q.  Ma'am, you would agree with me that this is not a complete

10  copy of the actual agreement for legal services, correct?

11  A.  **Well, it (inaudible) a screen shot if you can scroll down.**

12  **So it is not a copy.  It is a screen shot.**

13  Q.  Ma'am --

14  A.  **It's a screen shot.**

15  Q.  You just testified a few minutes ago that the entire

16  agreement is important for your readers; is that correct?

17  A.  **Well, I told (inaudible) that the entire information of**

18  **this agreement is important for our readers.**

19  Q.  But how are your readers supposed to know what the entire

20  agreement actually provides if you attach only a screen shot?

21  A.  **Oh, that's easy.  If they are interested in that they can**

22  **ask us in (inaudible).  They have a phone to call us and they**

23  **do follow us.  And they can ask, you know, in our newsletter**

24  **and there are other ways (inaudible) could ask for a complete**

25  **contract if they were interested in that.**

1  Q.   I see.  So what is wrong with this portion of the agreement

2  as you included it in your publication?

3  A.   **I don't think there's necessarily something wrong with it.**

4  Q.   So why would you include it, then, if there is nothing

5  wrong with the agreement?

6  A.   **I already answered that because I think it is important**

7  **information for our audience.**

8  Q.   Ma'am, how much is the total fee identified for legal

9  services in this screen shot that you have included here?

10 A.   **$6,000.**

11 Q.   Is there any reference to a guarantee or additional monies

12 that may be owed as part of representation?

13 A.   **Guarantor for this service is illegal.  So it couldn't be**

14 **part of a contract sense, somewhere, I guess.  You cannot pay**

15 **for a guarantor.  That's illegal.  You cannot provide**

16 **guarantors.  That is also illegal.**

17       MR. HAFT:  Just give me one moment, Your Honor.

18 BY MR. HAFT:

19 Q.   Ma'am, if I can just direct your attention to the bottom of

20 that screen shot under the section legal fee.  There's a

21 notation that starts with this contract for legal services.

22       Do you see where I am referring to?

23 A.   **I'm sorry.  I don't.**

24 Q.   Okay.  Do you see where the term legal fee is in all caps

25 and bold?

1       MR. RAIKHELSON:  I'm highlighting it for you.

2       MR. HAFT:  Thank you, Counsel.

3  BY MR. HAFT:

4  Q.  Do you see what I am referring to, ma'am, this section that

5  has been highlighted by your counsel?

6  A.  **Yes, I see a (inaudible).**

7  Q.  And you would agree with me that this section that has been

8  highlighted states:

9       This contract for legal services, according to lawyers, is

10  a fiction."

11      End of sentence.  You would agree that that statement

12  appears, correct?

13  A.  **I do not agree to that.  Actually, it's a (inaudible).**

14  **It's not what we stated.**

15  Q.  Well, ma'am, would you agree with me that this statement

16  appears in your article under the Mil Mujeres attorney/client

17  agreement that is as part of your publication?

18  A.  **It does not appear because this translation specifically is**

19  **not accurate.  It doesn't appear in the article.**

20  Q.  Ma'am, we have been discussing the article published by

21  Rubic on February 2nd of 2023 written by Nada for at least the

22  last 30 minutes.

23      Is that the best of your recollection that we have been

24  discussing?

25  A.  **Yes.  What I was telling you actually the translations that**

1   **you submitted in this particular instance is not correct.**

2   Q.   So is it your testimony here today, ma'am, that your actual

3   article that was published does not contain this caveat that

4   the contract that you are including for my client isn't a

5   fiction?  Is that your testimony here today?

6   A.   **It includes a caption on a screen -- like it's a caption.**

7   **That's what we call it.  And it includes that this contract for**

8   **legal services, according to lawyer's opinion is problematic.**

9   Q.   So is that yes or no that your actual article includes this

10  carve-out?

11  A.   **It's does not.**

12  Q.   It's a yes or no.

13          THE COURT:  Let me stop you.

14          I need to make sure I understand what's going on.

15  Isn't this just a copy of the website or is that the website

16  that was in Russian and this got translated?  Which one is it?

17          THE WITNESS:  (Inaudible) it's in Russian.

18          THE COURT:  This is not for the witness.  This is just

19  for me.

20          THE WITNESS:  I'm sorry.

21          THE COURT:  I'm just trying to clarify.

22          MR. HAFT:  It's translated from Russian.

23          THE COURT:  So is this exhibit I'm looking at is a

24  translation of what appeared on this woman's website?

25          MR. HAFT:  That's correct.

1        THE COURT:  And you guys are now having a disagreement

2   about this phrase this contract for legal services, according

3   to the lawyers, is a fiction.  And evidently that sentence

4   originally appears in Russian on the website; is that correct?

5        MR. RAIKHELSON:  That's correct.

6        THE COURT:  All right.  And who translated it?  I

7   mean, which side translated it?  Okay.  You guys did.  The

8   Plaintiff's side.

9        Okay.  You can keep going.

10  BY MR. HAFT:

11  Q.   Ma'am, immediately under that disputed writing you would

12  agree that it goes on to say that such an agreement is so

13  ridiculous that (inaudible) -- I presume is the source --

14  sensed something was wrong after all, correct?

15  A.   **Exactly, yes.  That contract was flagged by Yanina our**

16  **witness who called anonymous in name in the article.**

17  **(Inaudible) this is not agreement.**

18      **So she did say that actually part of (inaudible) what**

19  **triggers her opinion that she is dealing with immigration**

20  **imposters and that this particular contract was extremely**

21  **short.**

22      **It didn't cite which particular lawyer would be handling**

23  **her asylum case.  It just said a lawyer, which normally is not**

24  **the case.  Like, this often is not the case.  Normally people**

25  **will know who will be the lawyer representing them.**

1  Q.   I see.  So are you suggesting that Sasha, it was it her

2  belief that the screen shot was ridiculous, or the entire

3  contract was ridiculous?

4  A.   **The entire contract was ridiculous because it was our**

5  **belief as well and it still is.**

6  Q.   But you didn't include the entire agreement, correct?

7  A.   **It was an honest mistake.  It was just like some sort of**

8  **(inaudible) issue.  The contract is just (inaudible) one line.**

9         MR. HAFT:  Counsel, if you could just scroll to two

10  pages down.

11        MR. RAIKHELSON:  So this exhibit is 12 pages long.  Do

12  you want me to get to Page 7?  This is Page 7.

13        MR. HAFT:  That's fine.

14        MR. RAIKHELSON:  This is fine?

15        MR. HAFT:  Yes.

16  BY MR. HAFT:

17  Q.   So, ma'am, do you see at the top of this page where it

18  makes a reference that only one employee named Olga

19  Koloditskaya presumably is a lawyer.

20       Do you see where it says that?

21  A.   **Actually I do not see that.  Can you scroll up or**

22  **something?  That's not totally (inaudible).  All I can see is**

23  **part of a sentence.  Can you show me the whole sentence,**

24  **please?**

25        MR. HAFT:  If counsel will scroll for me, sure.

1           MR. RAIKHELSON:  I did.

2           MR. HAFT:  Okay.

3    A.   Only one (inaudible) Olga presumably (inaudible).  So we

4    are saying in this paragraph that on the website we didn't see

5    Natalia Panova, who is the person who we talked to and she

6    works -- and she told us (inaudible) on the (inaudible) only

7    one was the particular (inaudible) lawyer.

8         That's exactly what we said.  The translation (inaudible).

9    We didn't say that she is the only lawyer Mil Mujeres has.  We

10   said that what we see on the website only one person appears to

11   be a lawyer.

12   Q.   I see.  Isn't the executive director a California lawyer,

13   ma'am?

14   A.   I have no idea, actually.  We didn't mention him at all in

15   the article apart from the screen shots.  We never mentioned

16   the executive director Gary Royal.  And the translation into

17   Russian was (inaudible) at the time the publication.  So we

18   weren't quite sure if his name was translated properly into

19   Russian and what was his actual last name in English.

20   Q.   So, ma'am, what search did you actually do to confirm of

21   the employees identified on the website were actually lawyers?

22   A.   We found all the (inaudible) like Bar number and stuff like

23   that.  That's why we chose (inaudible).

24        We didn't think that one of them is -- we were (inaudible)

25   as a lawyer.  Not only, but we verified at least one and that's

1  the exact translation.  So out of (inaudible) we were able to

2  verify that at least one is a lawyer that is (inaudible).

3      And we didn't think that.  We said presumably, okay,

4  because still we are not quite sure (inaudible) is (inaudible)

5  Mil Mujeres.  If she is on the website then (inaudible) because

6  that's the connection there, right?  People (inaudible) you

7  already (inaudible) that's what we (inaudible).  Presumably all

8  (inaudible) a lawyer is part of Mil Mujeres' team.

9  BY MR. HAFT:

10  Q.  Ma'am, and you see below that when you refer to Natalia and

11  you claim in this article that she contacted Rubic herself?  Do

12  you see where I am referring to?

13      MR. HAFT:  Counsel, do you mind scrolling down a bit.

14      MR. RAIKHELSON:  Tell me when to stop.

15      MR. HAFT:  Right there.

16  BY MR. HAFT:

17  Q.  Do you see what I am referring to?

18  A.  **Yes.**

19  Q.  And did you speak to Natalia when she contacted Rubic?

20  A.  **Yes, I did speak to -- she didn't contact Rubic.  She**

21  **contacted me, specifically.**

22  Q.  But you would agree that the article says that she called

23  Rubic, herself, correct?

24  A.  **Yes.**

25  Q.  So why would you publish an article where you personally

1  spoke to her, but claim that Rubic spoke to her?  Are you

2  Rubic, ma'am?

3  A.  **Rubic was my company.**

4  Q.  So how come it says she called Rubic herself?  She spoke to

5  who exactly?

6  A.  **Could you repeat the question, please?**

7  Q.  Ma'am, are you Rubic?  Do you use your name interchangeable

8  with Rubic?

9  A.  **My name is Katerina Panova.**

10 Q.  So who else could she have spoken with other than you at

11 Rubic?

12 A.  **(Inaudible).**

13 Q.  How many employees do you have?

14 A.  **Around ten.**

15 Q.  Sitting here today do you have any knowledge as to whether

16 any other employee, aside from yourself, spoke to Natalia?

17 A.  **No.  I do not have a knowledge that Natalia spoke to**

18 **somebody else apart from me.**

19 Q.  Okay.  And what did you and Natalia discuss when she called

20 you?

21 A.  **Well, she did discuss that she was very unhappy that you**

22 **mention Mil Mujeres and other immigration imposters and that**

23 **she wants us to take it down or she will sue and she will win**

24 **because they have money and we do not.**

25 Q.  Ma'am, you testified earlier that this was the only article

1  that Mil Mujeres was mentioned in; isn't that correct?

2  A.  **I testified this is the only article that was dedicated to**

3  **Mil Mujeres and I also told you that we mentioned Mil Mujeres**

4  **in other articles and one other players on the U.S./Mexican**

5  **border providing services.**

6  Q.  Okay.  So, ma'am, the immigration fraudster that you are

7  referencing here, Alona (inaudible) to your knowledge, does she

8  have any affiliation with Mil Mujeres?

9  A.  **I didn't know.**

10  Q.  Is there any particular reason that you felt that it was

11  appropriate to include reference to Mil Mujeres in an article

12  dedicated to a fraud committed by an unrelated individual?

13  A.  **Well, they are (inaudible) in terms of Russian speaking**

14  **actors who are providing services for immigrants in a specific**

15  **(inaudible) providing services for asylum seekers.**

16  **So Mil Mujeres is providing services to Russian speaking**

17  **asylum seekers and so (inaudible).  And she admitted to, you**

18  **know, committing immigration fraud in court and, yeah, that's**

19  **the connection.**

20  Q.  So other than working in the same industry or field, so to

21  speak, you are not aware of any other connection between the

22  two; is that correct?

23  A.  **I am aware of the connection.  We believe that (inaudible)**

24  **Mil Mujeres committed immigration fraud.  That's the**

25  **connection.**

1  Q.   And what fraud has Mil Mujeres been convicted of, according

2  to you?

3  A.   **Well, we didn't mention they were convicted of fraud.**

4  Q.   Well, ma'am, you just stated that the reason you referenced

5  them in the same article as a convicted fraudster is because it

6  is your belief that they are both committing immigration fraud.

7       Was that not your testimony a moment ago?

8  A.   **Yes, it is.**

9  Q.   Okay.  So my question to you is what fraud has Mil Mujeres

10 been convicted of committing?

11 A.   **I didn't tell that Mil Mujeres was convicted of committing**

12 **immigration fraud.  I told that we believe they are committing**

13 **immigration fraud.  I didn't say -- I never said that they were**

14 **convicted of immigration fraud.**

15 Q.   Ma'am, you understand that by including Mil Mujeres in an

16 article that is dedicated to the story about a convicted

17 fraudster implies their involvement or their commitment of a

18 similar type of fraud, correct?

19          MR. RAIKHELSON:  Objection, Your Honor, speculation.

20          THE COURT:  She can answer her understanding.

21 A.   **No.  Actually, that is not true because specific fraud that**

22 **Mil Mujeres did and was convicted of was that she made up**

23 **asylum cases.  Stories for Russian speaking immigrants.  And**

24 **our understanding was Mil Mujeres is involved in is different**

25 **type of immigration fraud.**

1   Q.   Yet you included them in the same article?

2          MR. RAIKHELSON:  Your Honor, it has been covered.

3          THE COURT:  I agree with that.  The point you want to

4   make is really an argument.  So you can move on.

5   BY MR. HAFT:

6   Q.   Ma'am, what's the source of revenues for Rubic?

7   A.   **Advertising and information for audience.**

8   Q.   Advertising from who, ma'am?

9   A.   **Different businesses.  Mostly small businesses and all of**

10  **them (inaudible) businesses.**

11  Q.   Are there immigration attorneys?

12  A.   **Yes, we have several immigration attorneys for advertisers.**

13  Q.   Sitting here today, ma'am, are you aware of any clients

14  that have read your publications that used the attorneys

15  advertised in your website?

16  A.   **I'm sorry.  Can you repeat that the question?  I don't**

17  **understand it.**

18  Q.   Are you aware of any clients --

19         MR. HAFT:  Strike that.

20  BY MR. HAFT:

21  Q.   Ma'am, do you believe that readers of your articles are

22  more likely to use your recommended attorneys than Mil Mujeres?

23         MR. RAIKHELSON:  Objection.  Speculation as to what is

24  in the mind of the readers.

25         THE COURT:  Sustained.

```
 1  BY MR. HAFT:
 2  Q.   Ma'am, since you began publishing articles about Mil
 3  Mujeres, has all the revenue from immigration attorneys
 4  increased?
 5  A.   Actually, it decreased.
 6  Q.   Why do you think that is, ma'am?
 7            MR. RAIKHELSON:  Objection.  Calls for speculation.
 8            THE COURT:  She can answer.  Go ahead and answer.
 9            THE WITNESS:  I answer, right?
10            THE COURT:  Yes, you can answer.
11  A.   Because immigration lawyers do not like that we (inaudible)
12  publications independent from publication can against their
13  colleagues, I guess.
14            MR. HAFT:  Okay.  I don't think I have anything
15  further for this witness.
16            Could we just take a brief recess, if possible?
17            MR. RAIKHELSON:  I do not have no redirect.
18            THE COURT:  All right.  No redirect.  This witness is
19  excused and you are wanting a break.
20            MR. HAFT:  Just to use the restroom.
21            THE COURT:  Tell me about this next witness.  How long
22  do you expect them to be?
23            MR. RAIKHELSON:  Maybe 15 minutes.
24            THE COURT:  Okay.  Less than this one?
25            MR. RAIKHELSON:  Substantially less than this one.
```

```
 1              THE COURT:  All right.  Then I will let you have the
 2  break.
 3              MR. HAFT:  I appreciate it, Your Honor.  Thank you.
 4              THE COURT:  Okay.
 5  (Recess.)
 6              THE COURT:  All right.  Everybody.
 7              We are back on the record.  I think we are done with
 8  Miss Panova.  So we can excuse her as a witness and you can
 9  call your next witness, please.
10              MR. RAIKHELSON:  Yes, Your Honor.  The next witness I
11  call is Yanina who is in the waiting room.
12              THE COURT:  All right.
13              MR. RAIKHELSON:  And the interpreter.
14              THE COURT:  And the interpreter.
15              All right.  So since we are using an interpreter and
16  we are not going to have simultaneous interpretation, then that
17  means we have to go in bite size pieces and that is for both
18  counsel.  So give your questions in bite size pieces and
19  hopefully the witness will do the same and give us bite size
20  answers.
21              MR. RAIKHELSON:  Hold on.  The witness isn't here.
22              THE INTERPRETER:  Oh, okay.
23              MR. RAIKHELSON:  It shows what?
24              THE COURTROOM DEPUTY:  Joining.  I admitted her back
25  from the waiting room and so she is joining.
```

1          MR. RAIKHELSON:  Got it.

2          THE INTERPRETER:  (Inaudible).

3          MR. RAIKHELSON:  No, she can't hear you.

4          THE INTERPRETER:  Okay.

5          THE COURT:  Mr. Raikhelson, is that how you pronounce

6    your last name?

7          MR. RAIKHELSON:  I do.

8          THE COURT:  Do you speak Russian?

9          MR. RAIKHELSON:  I do, which is why I was answering

10   the interpreter.

11         THE COURT:  Okay.

12         THE INTERPRETER:  All right.  Your Honor, do you need

13   me to start interpreting?

14         THE COURTROOM DEPUTY:  She needs to unmute herself.

15         MR. RAIKHELSON:  Can you ask Miss Sharilo (phonetic)

16   to unmute her microphone?

17         THE INTERPRETER:  (Inaudible).

18         THE COURTROOM DEPUTY:  Miss Sharilo, please raise your

19   right hand.

20         THE WITNESS:  (Complied.)

21   (Witness sworn.)

22         THE COURTROOM DEPUTY:  Please state your full name for

23   the record.

24         THE WITNESS:  Yanina Sharilo.

25         MR. RAIKHELSON:  May I proceed, Your Honor?

```
 1            THE COURT:  Yes.
 2            MR. RAIKHELSON:  Okay.
 3                 YANINA SHARILO, DEFENSE WITNESS SWORN
 4                      CROSS EXAMINATION
 5  BY MR. RAIKHELSON:
 6  Q.   Miss Sharilo, you and I have never met before; isn't that a
 7  fact?
 8            THE INTERPRETER:  Can you repeat that for the
 9  interpreter?
10            MR. RAIKHELSON:  Sure.
11  BY MR. RAIKHELSON:
12  Q.   You and I have never met before; isn't that a fact?
13  A.   No.
14  Q.   But you are familiar with Mil Mujeres; isn't that true?
15  A.   Yes, a little bit.
16  Q.   When is the first time you have contacted anyone from Mil
17  Mujeres?
18  A.   Well, it was in February.  I can qualify if my
19  recollection, but we arrived to Mexico and then we sign to
20  cross the border.
21            THE INTERPRETER:  May the interpreter interrupt?
22            MR. RAIKHELSON:  You can continue.
23  A.   I (inaudible) sponsor for the United States.
24  BY MS. RAIKHELSON:
25  Q.   You can continue.
```

1  A.   So at that time I forgot that I know -- I knew we

2  (inaudible).  Like before I knew about that in capacity of the

3  journals.  So at that time I needed the sponsor urgently.  So I

4  placed an ad on Craig's List that I am looking for a sponsor in

5  the United States, me and my child, and I received a contract

6  of Natalia (inaudible).

7  Q.   And who gave you the contact to Natalia (inaudible)?

8  A.   Well, it was sort of a certain person.  So many steps that

9  took place on Telegram.  I don't remember exactly who it was,

10 but somebody gave me this contact and I got in touch with her.

11 Q.   And you got in touch with her how, through Telegram?

12 A.   Yes.

13 Q.   Okay.  And you told her that you were looking for a

14 sponsor, correct?

15 A.   Yes.

16 Q.   Okay.  And did Nada (inaudible) say that she works with or

17 for Mil Mujeres?

18 A.   Well, yes, she told me about all that, but at this time I

19 didn't pay much attention to it because she (inaudible) to me

20 (inaudible) or on direct contact, or somebody, where I can get

21 a sponsor myself.

22 Q.   Okay.  Did she offer to find you a sponsor for $800?

23 A.   Yes.

24 Q.   Okay.  And a $400 document fee or document processing fee?

25 A.   Well, no, she didn't ask for $400 document fee.

1    She told (inaudible) about my situation and she offered a

2  free consultation with a lawyer.  And at that time,

3  presentation was very helpful for me.

4  Q.   Okay.  And do you know the name of the lawyer?

5  A.   She introduced himself as Gary.  I don't remember his last

6  name.

7  Q.   And you spoke to Gary?

8  A.   Well, yes, and she gave me the site of the company and on

9  the site and what (inaudible) was posted and he said this is

10  me.

11  Q.   And if I tell you that that individual's name is Gary

12  Royal, would that refresh your recollection?

13  A.   Yes.

14  Q.   Okay.  And did Gary Royal make the representation that he

15  is a lawyer from Mil Mujeres Legal Services?

16  A.   Well, I don't remember if he said that she was a lawyer, or

17  the conversation was not very long, but it wasn't very short

18  either.  He listened to my situation and he spoke Russian and

19  he said that after I sign the contract he would call the

20  consular right away for $6,000.

21  Q.   Okay.  And did you sign that contract?

22  A.   Well, I received the contract to my e-mail.  I was

23  (inaudible) and it didn't struck me as a serious contract.  It

24  didn't reflect the essence of what was going on and I looked at

25  their website.  I felt that it was low quality and the

1  **(inaudible) stated on their website didn't reflect the services**
2  **they were supposed to provide.  So I didn't go forward with it.**
3  Q.   Okay.  Well, what services did they tell you they would
4  provide that wasn't in the contract?
5  A.   **(Inaudible) legal services, but judging by the conversation**
6  **the (inaudible) political asylum that I would do later.**
7  Q.   Did you believe that part and parcel of the contract, the
8  $6,000 included the $800 fee for a sponsor?
9         THE INTERPRETER:  Actually, can you repeat that for
10  the interpreter?
11        MR. RAIKHELSON:  Sure.
12        Did you believe that part and parcel of the contract
13  for $6,000 included the $800 for the sponsor or to your
14  understanding was that separate?
15        THE INTERPRETER:  Thank you.
16  A.   **$800 were separate from $6,000, yes.**
17  BY RAIKHELSON:
18  Q.   And did you pay the $800?
19  A.   **No.**
20  Q.   And why is it that you didn't pay the $800?  What was
21  concerning to you?
22  A.   **Well, I knew that it was unlawful and I tried to find a**
23  **sponsor that is required (inaudible).**
24  Q.   So, in other words, you were concerned about committing
25  immigration fraud.  Is that fair?

1          MR. HAFT:  Objection.

2    A.   **Of course**.

3          THE COURT:  Objection is overruled.  I will let her

4    answer and she already answered it.

5          MR. RAIKHELSON:  Yes.

6    BY MR. RAIKHELSON:

7    Q.   I want to show you a document.  This is a series of text

8    messages and --

9          MR. RAIKHELSON:  Your Honor, you have to excuse me was

10   this already been admitted in evidence?

11         THE COURT:  It has never been admitted.  Would you

12   like to admit it?

13         MR. RAIKHELSON:  I would.

14         THE COURT:  Any objection?

15         MR. HAFT:  No objection.

16         THE COURT:  All right.  This will be admitted.  I

17   think it is A; is that right?

18         MR. RAIKHELSON:  It is A, yes.

19         THE COURT:  All right.  Exhibit A will be admitted.

20   BY MR. RAIKHELSON:

21   Q.   Okay.  Miss Sharilo, can you see what has been marked as

22   Exhibit A?

23   A.   **Yes**.

24   Q.   This is the entirety.  Exhibit A is the whole thing.

25         THE INTERPRETER:  I'm sorry?

1        MR. HAFT:  Well, your Honor, we are going to object to

2   this actually because, you know, this is not a complete text

3   exchange from prior testimony.  So if that's what they are

4   seeking to admit here, we are going to object to the admission

5   of this Telegram chat.

6        THE COURT:  All right.  And just so that I am

7   remembering this correctly, what we have here is a Telegram

8   exchange that somebody deleted in part before they crossed the

9   border; is that right?

10        MR. HAFT:  That's allegedly what happened here.  Yes,

11   Your Honor.

12        THE COURT:  And so what we are looking at here is the

13   entirety of the exchange that was left after a piece got

14   deleted; is that right?

15        MR. HAFT:  We are not really clear as to the extent of

16   what was deleted, Your Honor.  So portions prior to the

17   deletion and then starting up again at some point post

18   deletion, but it is unclear that it actually took place in the

19   context of this chain.

20        THE COURT:  All right.  I understand your objection.

21   I am going to overrule.  I belive that those arguments go to

22   the weight and I will take that into consideration.

23        MR. HAFT:  Thank you, Your Honor.

24        THE COURT:  Exhibit A will be admitted.

25        MR. RAIKHELSON:

1  BY MR. RAIKHELSON:

2  Q.   Now, Miss Sharilo, these are communications between you and

3  who?

4  A.  **Natalia who would produce herself as an employee of Mil**

5  **Mujeres.**

6  Q.   Okay.  Now earlier you testified that you don't remember

7  who gave you the contact.  Do you recall someone by the name of

8  (inaudible), Gregory?

9  A.  **Like I said, they were multiple groups.**

10 Q.   Okay.  Now, the question that I want to ask you is do you

11 recall deleting any e-mail or any Telegram exchange before

12 crossing the U.S./Mexican border?

13 A.  **Well, no, I had this exchange on this messenger while I**

14 **still had Russian (inaudible) in Telegram, but later when I had**

15 **American phone (inaudible), this exchange for some time it was**

16 **still there, but later in (inaudible) number and also I can**

17 **explain why I saved those screen shots.**

18 Q.   Okay.  Why did you send those screen shots?

19 A.  **Well, so I (inaudible) over for $6,000, I thought all**

20 **communications (inaudible) because I realized that I couldn't**

21 **(inaudible) their services.  I didn't like their services.**

22 **So I found -- I got in touch with Katerina who would be my**

23 **sponsor for free and who told me that I should (inaudible) from**

24 **the get-go, but in the meantime I simply forgot about her .**

25 **And right before us crossing the border, Natalia got in touch**

1  **with me and then (inaudible).**

2  Q.  Let me just ask this question just so we have clarity.

3      The text message exchange, you're in green and Natalia is

4  in white, right?

5  A.  **Yes.**

6  Q.  And then, going from the top -- and this is Page 3 of 5 on

7  Defendants' Exhibit A.

8      The question is did you find a sponsor?  You ended up not

9  contacting us for a sponsor.  And then you wrote, as you

10  testified earlier, that you found a free one and yours is very

11  expensive?

12      Is that what it says?

13  A.  **Yes.**

14  Q.  And then Natalia wrote that she did not offer you any

15  sponsor and she disputed what you had said.  And then you

16  wrote, your text is very disgusting.

17      Why did you write your text is very disgusting to what

18  Natalia said?

19  A.  **Okay.  Well, the problem is they forgot, but (inaudible) I**

20  **had told them that this is my only son and he is part Ukrainian**

21  **and he is a surviving twin and he is very dear to my heart.**

22  **For some reason she (inaudible).**

23  Q.  Okay.  Now, when you said yours is very expensive, did you

24  mean the contract for legal services of $600 or did you mean

25  the sponsor for $800?

```
1           MR. HAFT:  Objection.
2           THE COURT:  Overruled.
3   A.  $6,000 and $800.
4   BY MR. RAIKHELSON:
5   Q.  Now let me ask you, are you familiar with the various
6   articles that are the subject of this lawsuit?
7   A.  No.
8   Q.  Have you read those articles?
9   A.  I didn't understand the question.
10  Q.  Well, let's take a look at them and you tell me if you
11  recall any of the articles.  Have you ever read this article
12  that I am showing on my screen?
13  A.  I don't see anything.  I see (inaudible).
14  Q.  Okay.  That's strange.  Okay.  How about now?
15      The question is have you ever --
16  A.  (Inaudible).
17  Q.  Okay.  And did you form any opinion about Mil Mujeres after
18  reading this article?
19  A.  No.
20  Q.  What was your opinion formed based on your interacts with
21  Mil Mujeres?
22  A.  Well, the very article mentions (inaudible) with whom I had
23  contact and whom I consider (inaudible) because he sold me a
24  franchise that was not in existence and he then (inaudible).
25  Q.  And do you believe that individual is affiliated in any way
```

1  with Mil Mujeres?

2  A.  **I don't know.  (Inaudible).**

3  Q.  Okay.  So aside from your interactions with Mil Mujeres

4  this article didn't form the basis of your opinion about

5  Mil Mujeres?

6  A.  **No.**

7  Q.  How about this article:  New scammers on U.S./Mexican

8  border Mil Mujeres already threatened Rubic.  Do you see that?

9  A.  **I saw this article, yes.**

10  Q.  Okay.  Is the information that you have provided to my

11  clients, did they form the basis of this article?

12  A.  **Please clarify the question.**

13  Q.  Well, let me ask it this way.

14      I am showing you text messages that are making the

15  representation that are part and parcel of Exhibit 18 -- or

16  Docket Entry 18-2, which has been admitted.

17      Are these the same text messages -- well, not the same.

18  Are these text messages from you that form the basis of this

19  article?

20  A.  **(Inaudible) but the text messages about the existence of**

21  **those text messages (inaudible) and interpreter and she didn't**

22  **even know that I saved those text messages.**

23  Q.  Okay.  So you provided these text messages to my clients

24  after the article was published?

25  A.  **(Inaudible).**

1  Q.   I understand what you said in Russian.  Is it true that you

2  provided these text messages to my clients in May?

3  A.   **Yes.**

4  Q.   Okay.  So these text messages are from you?

5  A.   **Yes.  I sent them on a different app.  Now I have those**

6  **text messages as (inaudible) and I saved on my phone.**

7  Q.   Okay.  And this message shows the $800 fee that you were

8  offered to be charged and I am highlighting that on my screen;

9  is that correct?

10  A.   **So the text messages don't go to me.  That (inaudible).**

11  Q.   Didn't you testify that these were your text messages?  You

12  have to help me understand.  Are these your text messages?

13  A.   **Well, I don't see part the screen.  I am being shown on the**

14  **phone the text messages what (inaudible).**

15  Q.   All right.  Let's take a look at the very beginning.

16      This is a text message earlier chain.  It says:  Good day.

17  I got your contact from Gregory (check).  I need a sponsor.

18      Is that what this says?

19  A.   **Yes.**

20  Q.   Okay.  Now let's go back to these messages that you first

21  said were yours and now you are saying are not yours or you are

22  not sure.  It says:  Good day.  I got your contact..."  And it

23  is blurred out.  "I need a sponsor."

24      Is that what that says?

25  A.   **Yes, that's what it says here.**

1  Q.   Okay.

2  A.   **But I didn't provide the end of the exchange.**

3            MR. HAFT:  Your Honor, we are also going to object.

4  These are not certified translations of this text exchange

5  neither.  So I can't tell at one from the other --

6            THE COURT:  Neither can I.

7            Hold on.  I am going to ask the witness and the

8  interpreter to be quiet for a second so I can hear the lawyer.

9            Say that again.

10           MR. HAFT:  What counsel is asking her about is

11 strictly in Russian.  So unless there's some type of

12 stipulation that what is being certified as being translated

13 separately is the same text chain that I have no idea what she

14 is testifying to here because it is in Russian only.

15           THE COURT:  Well, we can ask the translator, the

16 interpreter is a certified translator and she can read it.

17           MR. HAFT:  That would be fine, Your Honor, but we

18 haven't gotten that far --

19           THE COURT:  So to the extent that you are going to ask

20 her questions about the actual Russian texts, I will ask you to

21 direct the certified translator to that certain text and ask

22 her to translate it for us.

23           I take it, Madam Interpreter, that you can read

24 Russian as well, correct?

25           THE INTERPRETER:  Yes, Your Honor.

1    THE COURT:  All right.  So to the extent that becomes

2    necessary do it that way.

3    MR. HAFT:  All right.  Thank you.

4    BY MR. RAIKHELSON:

5    Q.  Miss Sharilo, did you say that these, the first two are

6    yours and the last one isn't yours?  Is that what you are

7    testifying to or is your testimony (inaudible) or am I

8    mishearing you?

9    A.  **Well, I received a similar text message in the chat**

10   **regarding $600, but of the screen shot because I knew that it**

11   **is very expensive and (inaudible).**

12   Q.  600 or $800?

13   A.  **$800.**

14   Q.  Okay.  But you said you received that offer from Natalia,

15   but your testimony is that you didn't screen shot it, correct?

16   A.  **Well, the screen shot is not my exchange.  I didn't provide**

17   **it.**

18   Q.  Okay.  But you were offered a sponsor for $800, correct?

19   A.  **Yes.  And the middleman was Natalia.**

20   Q.  Okay.  In this article they reference someone named Sasha.

21       Do you know if you are Sasha because I know that is a

22   pseudonym, or if someone else was Sasha?  Well, let's try that

23   again.  Let me just strike that.

24       Do you know if you were Sasha as referenced in this article

25   or do you not know who Sasha is?

1  A.  **No.**

2  Q.  Did you read this article that says new scammers on the

3  U.S./Mexican border are Mil Mujeres Foundation?

4  A.  **Well, no, I didn't read this article because I don't read**

5  **English, but I am a subscriber for Russian language and I read**

6  **the article that said that Mil Mujeres filed a lawsuit against**

7  **her and (inaudible) I can be a witness for in this motion.**

8  Q.  Okay.  Did you tell Kata (phonetic) that you can be a

9  witness because you believed everything that Kata wrote was

10  true?

11  A.  **Yes.**

12  Q.  And you felt it was true based on your own experiences with

13  Mil Mujeres, correct?

14  A.  **Of course.**

15       MR. RAIKHELSON:  I have nothing further.

16       THE COURT:  Okay.

17       MR. HAFT:  I have a few questions.

18       THE COURT:  Go ahead.

19                   CROSS EXAMINATION

20  BY MR. HAFT:

21  Q.  Ma'am, you testified earlier that you provided Miss Panova

22  text messages back in May of 2022 from someone named Natalia;

23  is that correct?

24  A.  **May of 2023.**

25  Q.  Well, ma'am, the article that Counsel just showed you a few

1  minutes ago, are you aware that that was published in February

2  of 2023?

3  A.   **Well, maybe -- yes, I (inaudible).  And maybe this was a**

4  **good time, but the ending of my exchange with Natalia -- well,**

5  **she -- where I consider her text messages as I said (inaudible)**

6  **a violation of my personal (inaudible).  I feel (inaudible) to**

7  **her in May.**

8  Q.   Ma'am, how would Miss Panova's publication gotten copies of

9  your text messages three months before you sent them?

10  A.   **Well, I don't deny them, but I might have forgotten, but I**

11  **(inaudible) from the beginning (inaudible) exchange, but saying**

12  **that my messenger with old phone number.**

13  Q.   Ma'am, you testified earlier that at no time did anyone

14  from Mil Mujeres ever offer you $400, or tell you that there is

15  a $400 additional document fee; is that correct?

16  A.   **No.**

17  Q.   And no one ever told you there was a $400 document fee; is

18  that correct?

19         MR. RAIKHELSON:  Objection; asked and answered.

20         THE COURT:  Overruled.  She can answer.

21  A.   **Well, I didn't remember.  I didn't pay much attention to**

22  **that because at that time is (inaudible).**

23  BY MR. HAFT:

24  Q.   I see.  Ma'am, you would agree that the text message chain

25  that we have been looking at in the article that you are not

1  sure whether you sent or not makes reference to a $400 document

2  fee; is that correct?

3  A.  **Well, I am able to see part of the screen -- I mean, I can**

4  **see the screen, but I can't see the whole message at times.  It**

5  **probably depends on the screen**.

6  Q.  Okay.  Ma'am, do you recall ever deleting a part of a text

7  conversation or a Telegram conversation you had with Natalia

8  from Mil Mujeres?

9  A.  **No, I didn't (inaudible) text messages with Natalia**.

10        MR. HAFT:  I have nothing further, Your Honor.

11        MR. RAIKHELSON:  I have nothing.

12        THE COURT:  Okay.  All right.  Then this witness will

13  be excused.  Thank you.

14        MR. HAFT:  And the interpreter can also be excused,

15  Your Honor.

16        THE COURT:  All right.  You as well, Madame

17  Interpreter.  Thank you.

18        THE INTERPRETER:  Thank you, Your Honor.  Have a good

19  day.

20        THE COURT:  All right.  Anything else from the

21  Defense?

22        MR. RAIKHELSON:  No, Your Honor.

23        THE COURT:  All right.  So you are resting.  So any

24  rebuttal evidence?

25        MR. HAFT:  No, Your Honor.

```
 1        THE COURT:  All right.  So do you guys want to do
 2  brief closings?
 3        MR. RAIKHELSON:  I would.
 4        THE COURT:  All right.  So we will start with the
 5  Plaintiff.
 6        MR. HAFT:  Certainly, Your Honor.
 7        As the evidence clearly shows here, Your Honor, and in
 8  particular the text chain conversation we have discussed
 9  *ad nauseam* here today, the statements made and the supposed
10  conversations that are included are complete fabrications.
11        They are false and they are defamatory statements
12  intended solely to dissuade potential clients from using the
13  services of our client of the Plaintiff; a reputable well
14  established immigration law firm.
15        Not only does the evidence reflect that this article
16  and the text chains contained therein are complete
17  fabrications, we have established through the evidence
18  presented that the Court is taking judicial notice of that
19  there are seven licensed attorneys affiliated with the
20  Plaintiff.
21        The Plaintiff is a well-renowned nonprofit
22  organization providing services to immigrants seeking asylum
23  since 2007.  There is nothing that has been provided by the
24  Defense here that would substantiate a single false or
25  defamatory claim made in any of these publications.
```

1          The Plaintiff has clearly met its burden.  We have

2     clearly demonstrated that we are likely to succeed on the

3     merits of our claims that there are presumed damages for our

4     liable forsake claim.  That if the injunction is not granted,

5     the Plaintiff will continue to suffer irreparable harm as has

6     been demonstrated by the evidence presented here today.

7          That any type of injury that may be suffered by the

8     Plaintiff in the form of an injunction is significantly

9     outweighed by the harm that would be suffered by the Plaintiff

10    here.

11         And the injunction would serve the public interest by

12    a neighboring a well-established well-respected immigration law

13    firm to continue providing immigrants in desperate need of

14    services with the essential help and services needed to gain

15    asylum in this country.

16         THE COURT:  All right.  Let me ask you some questions.

17         First since we ended with the text chain let me get

18    your view of that.  You mentioned in your closing that the

19    evidence shows that the text evidence shows that the text chain

20    is a fabrication.  What do you mean by that exactly?

21         MR. HAFT:  Well, Your Honor, the text chain, the

22    witness just testified that was not her text chain.  Those were

23    not her messages.

24         Yet, the Defendants contend that she provided it to

25    them as the basis for this article.  The certified translation

1   of what is supposedly the entire text chain omits significant

2   parts of that same text correspondence that is part of the

3   article which implies, one, that my client is charging an

4   improper forum per dollar document fee.  And two, suggests that

5   charging an $800 sponsor fee on top of the $6,000 legal

6   services contract.

7           What is important for the Court to note, aside from

8   the fact that none of that is provided within the actual

9   certified text translation is that it is not illegal to charge

10  for a sponsorship of fee.

11          THE COURT:  Well, why didn't you ask that?

12          MR. HAFT:  It's not illegal.  My client doesn't offer

13  that service, but that in and of itself is not illegal.

14          THE COURT:  So it is not immigration fraud to charge

15  someone to be a sponsor?

16          MR. HAFT:  It is not and it is not a service that we

17  offer.  Nor was it a service that was ever offered to this

18  witness.

19          THE COURT:  Okay.  The text, first of all, is it

20  undisputed that there were texts between that witness and

21  someone from your client's law firm?

22          MR. HAFT:  That is undisputed.

23          What is also undisputed is that that witness from

24  those texts was directed to Mr. Royal who provided her with a

25  free consultation and that was the extent of their

1   relationship.  No sponsorship type services were offered to

2   her.  Nor is that something that the Plaintiff actually offers

3   as a service.

4        THE COURT:  There was one followup portion in the text

5   of something to the effect of someone from the law firm asking

6   you decided not to use us to get the sponsor, or something,

7   words to those effects.

8        MR. HAFT:  That's right.

9        THE COURT:  Doesn't that indicate that the law firm

10  was offering to arrange for the sponsor?

11       MR. HAFT:  Arranging and offering the service are two

12  distinct concepts here, Your Honor.  Part of getting status as

13  an asylum seeker here is to have a sponsor.  So there are

14  sponsors that may be recommended or provided names and contact

15  information.  We do not arrange that, though.

16       THE COURT:  Okay.

17       MR. RAIKHELSON:  Your Honor, may I add just one thing?

18       THE COURT:  Sure.

19       MR. RAIKHELSON:  If you continue reading the text the

20  person Natalia emphatically denies offering a sponsor to the

21  witness.

22       THE COURT:  But it seems incongruent because

23  immediately in the bubble up ahead it says you decided not to

24  use us?  And then, once she says, yes, I decided you were too

25  expensive.  And whoever is sending the text immediately say we

1   never offered that.  That seems strange to me.

2          MR. HAFT:  It does seem strange and I think that it is

3   just imprecise texting.  I think when it says for sponsor it is

4   more about a sponsor.  We are a law firm and we obviously need

5   to collect the information regarding a sponsor.  You never

6   contacted us for the sponsor and she goes, well, I found a

7   different sponsor and that is emphatically denied in the next

8   text.

9          THE COURT:  All right.  But at any rate you are saying

10  that it is not illegal to do that?

11         MR. HAFT:  It is not.

12         And frankly, Your Honor, my basic understanding is

13  that a sponsor would have to be someone who has their familiar

14  relationship or personal knowledge.

15         Miss Panova, wants to (inaudible) them for free.  I am

16  not aware of either of that criteria being met in any regard.

17  But, nevertheless, it is not an illegal act to offer

18  compensation for a sponsorship.

19         THE COURT:  Okay.  Let me ask you this.

20         Our research tends to show that when one is seeking a

21  preliminary injunction in trying to prove irreparable harm, it

22  is very, very difficult to get a preliminary injunction when

23  your claim is defamation because defamation can always be cured

24  by money damages.

25         And in your motion for preliminary injunction all of

1  the cases you cited to me for irreparable harm were trademark

2  copyright cases where there were issues of consumer confusion

3  and there are lots of cases out there that say losing a

4  customer can be irreparable harm in the trademark setting, but

5  there are almost no cases that say that in the context of

6  defamation cases.

7        So how do you get over that hurdle, other than the

8  cases that you cited in your motion, which I don't think apply,

9  how do you prove irreparable harm in a defamation context?

10 Because you can win this case and get a gigantic money judgment

11 against the Defendant and then your (inaudible) is there is no

12 irreparable harm.

13       MR. HAFT:  Your Honor, at this juncture in time based

14 on the services provided, if this is allowed to continue, these

15 unsubstantiated claims, which are unsupported by any type of

16 fact or testimony, the loss, the irreparable harm is the

17 continued loss of business of customers of resources.

18       It is not just a monetary amount.  The monetary amount

19 certainly comes into play, but the irreparable harm is what the

20 current effect of this malicious false and defamatory speech

21 encompasses.

22       So I would agree that the cases are distinguishable,

23 but these are a pretty unique set of facts under the

24 circumstances.  And it really more so has to do with the

25 political state of the world because part of this all turns on

1  when the war started that our client jumped from just focusing

2  on Latina women escaping from violence to helping folks seeking

3  asylum from Russia and the Ukraine.

4         So the irreparable harm, there really isn't a whole

5  body of case law that relates to this type of case.  So that's

6  how I would describe it to Your Honor.

7         THE COURT:  Okay.  All right.  Defense.

8         MR. RAIKHELSON:  Yes.

9         THE COURT:  Oh, one last question.

10        If I were to grant you an injunction you would have to

11 post a bond.  So what is your argument about bond?  How much

12 should the bond be?

13        MR. HAFT:  Well, Your Honor, it is a valid question

14 and it is a question that we have had or a discussion that we

15 have had with our client.  We believe with at this point

16 probably $75,000 to $100,000 would be reasonable under the

17 circumstances.

18        THE COURT:  Okay.  All right.  Defense.

19        MR. RAIKHELSON:  Okay.  Your Honor, as a threshold

20 matter -- and I will share my screen with the Court -- the

21 quote unquote attorney/client agreement -- and it is something

22 that I mentioned in opening and something that I asked the

23 Court to take notice of is between Mil Mujeres Legal Services

24 Inc.  The Plaintiff in this case is Mil Mujeres, Inc.

25        It seems to me that these are two different entities

1  with two different names.  Although they may be subsidiaries of

2  one another, but if the ultimate question is whose ox is gored

3  and who is the proper Plaintiff, who are these difficult, quote

4  unquote, defamatory statements being made against?

5          Well, we have to figure out the proper party because

6  right now there is no evidence to the extent that it is Mil

7  Mujeres.  Is it Mil Mujeres Legal Services, Inc., or is it Mil

8  Mujeres, Inc.  Because opposing counsel just said Mil Mujeres

9  is a law firm, but they are not a law firm.  Mil Mujeres, Inc.,

10  and Mil Mujeres Legal Services, Inc. are two distinct entities.

11          Now, as it pertains to the $800 and the Court's

12  question is, first of all, there was testimony from Yanina

13  saying that she was offered to pay for services for sponsor

14  services in the amount of $800.

15          Now opposing counsel mentioned something albeit by

16  accident, but it was correct.  To be a sponsor there has to be

17  some kind of familiarity.  So either familial bond or some kind

18  of work familiarity.

19          The fraud is not I am going to pay you.  The fraud is

20  I am going to say that we are familiar if you pay me the $800.

21  So it is not the transfer of money that is the fraud.  It is

22  the representations made to USCIS in order to come to this

23  great country and those representations being from the mentally

24  untrue.  So that's really the fraud and that's wherein the

25  fraud lies.  To the extent that --

1           THE COURT:  Can I stop you there?

2           MR. RAIKHELSON:  Sure.

3           THE COURT:  Because that is a question that I wrote

4   down to ask you.  So the alleged defamatory statement, at least

5   the very first one is that Mil Mujeres is a scammer.  So your

6   defense, I take it, is truth.

7           MR. RAIKHELSON:  Right.

8           THE COURT:  They are scammers.  So what is the scam?

9           MR. RAIKHELSON:  The scam is that they are exploiting

10  people that are fleeing from a war-torn country from the

11  Ukraine to come to the United States and meet at the Mexican

12  border.

13          And it is not merely legal services in the amount of

14  $600.  It is also services for the procurement of a sponsor

15  whereas that sponsor would have to be fundamentally dishonest

16  to USCIS in order to procure either some sort of residency, or

17  some sort of visa, or regardless, some type of legal entry into

18  the United States.

19          THE COURT:  They are getting fake sponsors.

20          MR. RAIKHELSON:  So getting fake sponsors,

21  essentially.

22          THE COURT:  All right.  Now I heard a lot about they

23  having not having licensed attorneys.  Is that part of the scam

24  in your view?

25          MR. RAIKHELSON:  Well, in my view the representation

1  that there are attorneys that we don't know whether they are

2  part of Mil Mujeres or not.  And that's actually part of what I

3  was saying that I object to this being done on declarations

4  because if, for example, they are saying that certain

5  individuals are Mil Mujeres employees, but nothing in their Bar

6  record shows that they are Mil Mujeres employees.

7       And no one testified that they have -- well, the only

8  person that testified is Yanina who said she spoke to Gary

9  Royal, who we don't know what his situation is based on the two

10  pending administrative actions as well as Olga Koloditskaya,

11  who never testified in this case.  No one testified that they

12  made contact with her, but even her Bar profile shows that she

13  works for Mil Mujeres.

14       So, essentially, you have a discrepancy of, well, I

15  don't know who the legal -- who the attorneys from Mil Mujeres,

16  Inc. is or Mil Mujeres Legal Services is.  And I think that

17  that is a very important distinction because you have someone

18  that was admitted into evidence.  Lisa Delaphe and she was a

19  Florida Bar number of 1002189 and her mailing address is Mil

20  Mujeres Legal Services and not Mil Mujeres, Inc.  So it is not

21  a distinction without purpose.  It is a legally viable

22  distinction.

23       And it goes back to the question of whose ox is

24  gored(phonetic) and who is making these representations against

25  whom and whether these representations truly are false or not.

1            THE COURT:  Okay.  I have one more.

2            And then, there was a lot of testimony about I think

3    so-called a fictitious contract and whether that is the correct

4    word or not, and the contract itself being published on the

5    website.  Is it your client's contention that there is

6    something about that contract that contributes to the scam?

7            MR. RAIKHELSON:  No.  There is nothing -- my client is

8    not contending that there is something in that contract that

9    is, quote unquote, a scam.

10           And I think what my client testified to is that the

11   contract just seems very vague and not typical of what one

12   would see with the lawyer and it raises red flags and I think

13   that's exactly what she said.  The contract in itself raises

14   red flags because it is not a typical contract that you would

15   you see for immigration services between a law firm and a

16   potential client.

17           THE COURT:  So to the extent that your defense to the

18   defamation is truth you would be arguing that it is true that

19   Mil Mujeres is a scam and the scam consists of two parts;

20   mainly that they help people get fake sponsors and that they

21   have attorneys that are not licensed.

22           MR. RAIKHELSON:  That's correct.

23           They have attorneys that are not licensed or not that

24   they are not attorneys that are not licensed, but that they

25   have attorneys that are not specific to Mil Mujeres, Inc.

1        THE COURT:  All right.  So you would say they are not

2   likely to prevail on their defamation claim because of those

3   arguments?

4        MR. RAIKHELSON:  I will say that they are not likely

5   to prevail on their defamation claim.  And the truth of the

6   matter is that they have absolutely no testimony.  Except for

7   declarations that were provided to this Court that are contrary

8   to what we have produced.

9        THE COURT:  All right.  So you can keep going with

10  your argument.

11       MR. RAIKHELSON:  All right.  Now, as for irreparable

12  harm, I think that is an interesting question the Court posed

13  regarding the bond.  And it is based on the case that I found

14  earlier that I told the Court about and that case is --

15       THE COURT:  There is some law that says when it is

16  impossible to calculate the damages that can be considered are

17  irreparable harm.

18       MR. RAIKHELSON:  Correct.  And in this case it is

19  clearly possible to calculate the damages because either they

20  would know or they can assume how many potential clients.

21       And again, these are clients of Mil Mujeres Legal

22  Services, Inc.  These are not clients of Mil Mujeres, Inc.  So

23  like I said it is a distinction.  And at the end of the day

24  whose ox is gored here.

25       Because if you are saying that you have cost me an

1  unknown amount of damage to the law firm aspect of the

2  business, well, the law firm is not a part and party of this

3  complaint.  It is the 501(c)(3) entity that is a party to this

4  complaint and so you have those issues.

5       And then, you have the issues that they can't have

6  their cake and eat it, too, and that's what I mentioned in my

7  opening argument.  You can say that because of the damages or

8  the defamatory statements to your cause that I can't calculate

9  my losses.

10      But if you can't calculate your losses, then you are

11  either considering that your losses are so substantial that

12  they would encompass the over $75,000 to meet this

13  jurisdictional limit and then some or you are saying that it is

14  not.

15      Now based on the bond that they are asking for, they

16  are saying that the bond that we are seeking is $75,000 to

17  $100,000.  So, essentially, it is the bond for what they are

18  considering their actual damages are.  Now how do they

19  determine what their actual damages are?

20      THE COURT:  The bond inquiry, when I decide to set a

21  bond, the bond is to cover the damages that might fall to your

22  client, but not an estimate of their damages.  If I issue this

23  bond, how would your client be hurt?  That is what I have to

24  figure out when I set the bond amount.

25      MR. RAIKHELSON:  I understand, Your Honor.

1          Then, I would rephrase my argument as this.  Is that

2    they haven't established irreparable harm.  In fact, there is

3    absolutely no one in any declaration that testified as to their

4    damages.  What they expect the damages to be.  That the damages

5    can't be calculable.  There is no one to testify.  It is not in

6    any declaration.  It is not anywhere.

7          They haven't even established -- they had the

8    opportunity to ask my client how many people viewed the article

9    because she said I know exactly how many people viewed each

10   article and they didn't ask that question.  I was surprised

11   they didn't ask that question.

12         Because at least at that point they can say, okay,

13   listen, you could say that hundred people or a million people

14   viewed the article and that's a million potential clients, but

15   even in that situation -- and I'm just going through this my in

16   my head.

17         Even in that situation you can calculate an exact

18   number because if you are having legal services in the amount

19   of, let's say, $6,000 and you have a million people who viewed

20   the article and now you have a million people who are not

21   customers or clients of Mil Mujeres Legal Services, Inc., then

22   that's a dollar amount you can calculate.

23         THE COURT:  Now can you give me your version of that

24   whole business with the text?

25         I asked the Plaintiff and now I am asking you from

1  your point of view what does the testimony show me about that

2  text?  Because I thought that your client clearly said that she

3  was told that the woman had deleted something and the woman

4  said she didn't delete anything.  So what am I to make of this

5  testimony with the text?

6        MR. RAIKHELSON:  Well, Your Honor, I don't want to be

7  disingenuous with the Court.  I mean, the testimony is what it

8  is.

9        My client said that she got these text messages.

10 These three text messages that are on her website from Yanina.

11 And why there are differences is because Yanina was afraid

12 about doing something illegal so she deleted them before

13 crossing the border.

14       Yanina testified that she didn't delete anything and

15 if there was anything deleted is because she switched phone

16 numbers from the Russian phone number to her American phone

17 number.

18       I mean, I think what the Court can consider is exclude

19 those text messages and say, okay, what does everyone agree to?

20 The first two squares of that website of the article, Yanina

21 testified is hers.  They are hers and the only discrepancy was

22 the date that they were provided because the date that she said

23 was in May, but the article was released in February.

24       I am assuming no one hacked Yanina's phone for these

25 text messages.  So it is probably likely that she said I might

1  have made a mistake and I might have sent these messages

2  earlier.  And then, we should just rely on what did she

3  actually testify to?

4        So even though that third text message blog whether it

5  was or wasn't deleted, it is meant to show the same thing that

6  she was offered to pay for sponsorship services in the amount

7  of $800.

8        And the only thing that is really in dispute is the

9  $400 because she said I don't remember and I was never charged

10  400 and no one ever offered $400 to me.  That's the only thing

11  that is different than what those text messages say.

12        So even if we just discount the things that were in

13  contravention because, Your Honor, I can't explain it and I

14  don't want to be disingenuous with the Court and make something

15  up.

16        We should look to what was actually testified to that

17  was cooperated and I think that even if we get there we get to

18  essentially the same place just to a lesser dollar amount.  It

19  is not $400, but $800.

20        THE COURT:  And are there any First Amendment concerns

21  on, you know, to the extent that your client is a journalist

22  and they are publishing -- it is essentially, she characterized

23  it as a media company and they are basically issuing reports on

24  matters of public interest.  Are there any First Amendment

25  issues with respect to this defamation claim?

1          MR. RAIKHELSON:  Well, I think opposing counsel

2    mentioned this in the case law that they cite to.  And like I

3    said, I want to be frank with the Court that just because

4    someone is a media company doesn't mean and just because there

5    is something that is a matter of public importance, it doesn't

6    mean that someone can publish false and misleading articles and

7    that's what the case law that they cite says.

8          And there isn't case law that rebuts that, but what I

9    would say is that there is a concern and other Courts

10   resolving, not specifically media companies, but specifically

11   as it pertains to defamation, there is a concern about what

12   would essentially be a gag order.

13         Because what Plaintiff is asking this Court to do is,

14   number one, delete everything that we find inappropriate.  So

15   not just the article that calls them scammers, but even an

16   article that even hints to them, or has Mil Mujeres next to

17   some other fraudster or scammer.

18         I think that was part of their cross-examination that

19   isn't it possible that one can infer that this great lawyer who

20   was convicted of fraud is somehow connected to Mil Mujeres.

21   And the answer was I don't know what other people would think,

22   but that is not what we did.  It is just the industry as a

23   whole.

24         So I think the major concern regarding the public's

25   interest is that people should be able to express and news

1  organizations should be able to express various things that

2  they have substantially verified.

3          So no one testified that, hey, I knew that this is

4  untrue, but I said it anyway, or I knew that where they were

5  trying to -- as they put it -- deliberately try to destroy Mil

6  Mujeres' business no one testified to that.  No one even

7  testified close to that.

8          My client testified that she received the information

9  from independent sources.  And to the extent possible, either

10 she, herself, verified it or someone on her staff verified it,

11 but as it pertains to the allegations of Mil Mujeres, I think

12 Yanina testified -- I asked her this question -- why is it that

13 you are testifying here today?  And I asked her is it because

14 you believe that all the information written in the article is

15 true and she said yes.

16         So it is the question is how far does one have to go

17 to verify something as true or untrue, or how far does a new

18 publication have to go and was it done with maliciousness?

19         And I believe that if it is something that is in the

20 public sphere that one would have to demonstrate some form of

21 maliciousness, which we don't have in this case.  At least no

22 one has testified to it.

23         THE COURT:  I think that if it is a public figure you

24 have to show malice.  I don't know if your report -- if they

25 are writing a story about somebody who is not a public figure,

1  like Mil Mujeres law firm, I don't know what the standard is

2  and I am going to ask them when I give them a chance.

3          MR. HAFT:  New York Times --

4          THE COURT:  You have to talk into the microphone, but

5  I will give you two minutes to rebut.  Do you have anything

6  else?

7          MR. RAIKHELSON:  No, Your Honor.

8          Just to very briefly summarize, I believe that they

9  can't prove -- and the Court should understand and the Court

10  probably does understand that asking for injunctive relief is

11  an extraordinary remedy.  All of the cases call it an

12  extraordinary remedy.  It is not something that is doled out

13  lightly.

14          So when I read cases that say this is an extraordinary

15  remedy, the default is no and show me why it should say yes.

16  And I don't believe that they have given the Court enough for

17  the Court to say yes.  I believe that the declarations are just

18  that.  Pieces of paper that have not been subject to

19  cross-examination.  My client and her witness have been subject

20  to cross-examination.

21          I believe that they don't suffer irreparable injury

22  because they are alleging money damages and those money damages

23  can be readily calculable.  Even they had the opportunity to

24  ask my client about the specific viewers and they didn't do so.

25          So I believe the evidence that they have provided is

1  weak at best and does not check the boxes that they need to

2  check.

3       THE COURT:  All right.  I will let you rebut and we

4  are going to get out of here.

5       MR. HAFT:  Just briefly, Your Honor.

6       As Your Honor pointed out malice is not the standard

7  here.  This is not a public figure and it doesn't rise to New

8  York Times (inaudible).  So we are not required to meet that

9  burden which is an exceptionally high burden.

10      Second, and I think counsel glossed over the fact that

11 his client testified that their viewership between website

12 source media and any other media arm, so to speak, is in excess

13 of two million people.

14      So I think it is deceptive to say only a hundred

15 people read this article because the article is circulated

16 amongst all of its readership or viewership.  However you want

17 to look at it, which we know is in the millions of people

18 figure.

19      So the damages as far as a monetary amount, it is not

20 quantifiable at this point.  And the harm that is continuing to

21 occur, the irreparable harm, is by the recirculation and the re

22 population of these falsities that keep going on and they are

23 unsubstantiated.

24      Not one single statement that was made in a negative

25 light regarding Mil Mujeres has been substantiated in any way,

 1  shape, or form.  It is not even verified.  The testimony here

 2  today was I didn't write the article.  I am just a publisher.

 3  I didn't verify it.  I don't know who verified it.  I don't

 4  know how it was verified.  That is negligent on its best day,

 5  Your Honor.

 6          THE COURT:  Okay.  Thank you very much for the

 7  excellent presentation by both sides.  I am going to take this

 8  matter under advisement and we will get you a ruling very

 9  shortly.

10          Thank you very much.

11          MR. HAFT:  Thank you, Your Honor.

12          MR. RAIKHELSON:  Are we in excused?

13          THE COURT:  We are in recess.

14          MR. RAIKHELSON:  Thank you.

15          MR. HAFT:  Thank you, Your Honor.  I appreciate it.

16          THE COURTROOM DEPUTY:  Counsel, what did we do with

17  Exhibit B?

18          THE COURT:  Okay.  Let's go back on the record.  Do

19  you have any problems with the exhibits, guys?  I think

20  everything came Plaintiff offered came in and just Defendants'

21  Exhibit A.

22          MR. HAFT:  Yes, Your Honor.

23          (Thereupon, the proceedings concluded.)

24

25

1

2                              CERTIFICATE

3

4         I hereby certify that the foregoing transcript is an

5   accurate transcript of the audiotape recorded proceedings in

6   the above-entitled matter.

7

8

9

10
    06/08/23                       Bonnie Joy Lewis,
11                        Registered Professional Reporter
                             CASE LAW REPORTING, INC.
12                          7001 Southwest 13 Street,
                          Pembroke Pines, Florida 33023
13                               954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25